**The STATE of Ohio, Appellee,**

v.

**BUTCHER, Appellant.**

[Cite as *State v. Butcher,* 170 Ohio App.3d 52, 2007-Ohio-118.]

Court of Appeals of Ohio,
Eleventh District, Ashtabula County.

No. 2005–A–0033.

Decided Jan. 12, 2007.

54

Thomas L. Sartini, Ashtabula County Prosecuting Attorney, and Angela M. Scott, Assistant Prosecuting Attorney, for appellee.

Joseph P. Szeman, for appellant.

WILLIAM M. O'NEILL, Judge.

{¶ 1} Appellant, Jerry Butcher, appeals from the judgment entered by the Ashtabula County Court of Common Pleas. The trial court sentenced Butcher to a total prison sentence of three life terms for his convictions for three counts of rape and two counts of kidnapping.

{¶ 2} On November 13, 2003, "T" and "D," aged six and five, respectively, were at the home of their grandmother, Mary Beth Askew, for an overnight visit. That evening, the girls, who are the children of Mary Beth's daughter, Bethany Askew, were accompanied by their younger brother. According to Mary Beth, the children frequently visited her home.

{¶ 3} Mary Beth was emptying the dishwasher while the girls were taking a bath together in the bathroom just adjacent to the kitchen area. Following their bath, the girls appeared in the bathroom doorway, acting very agitated and nervous. At trial, Mary Beth testified that the girls "were moving, like, from one foot to the other * * * and looking at each other and one would say [to the other] 'you tell her. No, you tell her. Oh, let's tell her together. Okay, we're going to tell her on the count of three.' "

{¶ 4} The girls then dropped to the floor "like little rag dolls," crying and moaning, and told Mary Beth that "Jerry was sexing with them." Mary Beth

stated that she walked up to where the girls were lying on the floor and put her arms around them, attempting to console them. At first, Mary Beth did not know who "Jerry" was, so she asked, and the girls told her "Jerry, who lives with Auntie Porsha." When she questioned the girls further, Mary Beth learned that Jerry had "put his man thing in them" and that this happened "at Jerry's house." Mary Beth was able to identify "Jerry" as Butcher.

{¶ 5} Naporsha (a.k.a. Porsha) Turner is the sister of T's father. Butcher lived with Turner in an apartment in Ashtabula, Ohio, and is the father of Turner's two children, Corey and Kaylee. Butcher also has a son, Jared, from a previous relationship.

{¶ 6} After Mary Beth managed to get the girls calm, she called her daughter Bethany and relayed what the girls had told her. Bethany subsequently called the police. The next day, Mary Beth and Bethany met with police and made a report.

{¶ 7} Butcher was charged with three counts of rape, in violation of R.C. 2907.02, first-degree felonies, and two counts of kidnapping, in violation of R.C. 2905.01, first-degree felonies. One count each of kidnapping and rape alleged acts against T, while the remaining two rape charges and the final kidnapping charge alleged acts against D. Butcher pleaded not guilty to the charges, and a jury trial was held. The following testimony occurred at the jury trial.

{¶ 8} Bethany stated that T had spent the night at Butcher and Turner's house "numerous times," but that D, who is not related to Turner, had spent the night there only twice. Bethany testified that the last time either child spent the night was after Kaylee's first birthday party, which took place on September 6, 2003, at Nappi's Roller Den in Ashtabula, Ohio.

{¶ 9} T and D both testified at trial. D recalled attending a skating party on the day of the incident, but could not remember where the party had taken place. D did recall spending that night at Turner and Butcher's home. D testified that while at Turner's house, she was sitting on the couch watching cartoons when Butcher summoned T and D upstairs to his bedroom. At the time, Turner was downstairs with the baby.

{¶ 10} Once in the room, the door was closed and Butcher ordered the girls to get naked. Although D did not remember who closed the door, T testified that Butcher shut and locked the door. D testified that Butcher had them lie face down on the bed and Butcher got on top of them. She reported that he put his "thingy" into her "private," which she said meant her "butt" and her "mouth." D did not specifically state what Butcher's "thingy" meant, but when asked, pointed to the area between her legs to indicate where Butcher's "thingy" was located.

She said that when Butcher put his "thingy" in her "butt" she felt sad, but it did not hurt. D testified that Butcher then put his "thingy" in her mouth.

{¶ 11} Afterwards, D stated that Butcher made T lie down and put his "thingy" in her "butt." D then testified, "[A]fter we were done, we had to go downstairs." When asked to identify "Jerry," D was unable to point out Butcher in the courtroom.

{¶ 12} T also testified at trial, remembering that there was a skating party that day, but she could not remember the exact date of the party. After the skating party, T remembered going to Turner's apartment in the late afternoon or evening. T knew that "Jerry" was Turner's boyfriend. T testified that she and D had gone to the room upstairs: "Aunt Porsha called us in and then she told us that Jerry wanted us upstairs and then we went upstairs to see what he wanted." T continued to testify as follows:

{¶ 13} "He told us to get naked and then he got naked and then after that, we sat down on the bed and then Jerry—Jerry put on this flavored stuff. It was banana in this tube and it didn't really come out, so he had to take off the lid and get some and put it on his private. And then he told [D] to lay down on the bed and she did. Then after that I was * * * sitting down on the bed looking around the room while Jerry—Jerry and [D] were on the bed. [D] was laying face down and Jerry was on top of her and his private was in her butt. * * * Then, after that, he did the same thing to me and I was laying the same way as [D] and he put more of that banana flavored stuff on it and he stuck his private in my butt, and then after that, he got his clothes on and we got our clothes on and he unlocked the door and then he opened it and then he told us not to tell anybody because he would go to jail, and so we went downstairs and we sat. We sat on the couch with the kids and we watched cartoons."

{¶ 14} When asked what she had meant by Butcher's "private," T said it was "under his stomach and between his legs," on the front part of his body. T testified that she knew the "stuff" Butcher put on his "private" was banana-flavored because it "said it on the tube right under it." T stated that she was not looking the entire time that Jerry was doing things to D, but that she heard her crying. T testified that when Butcher did the things to her, she was crying too. When asked to identify the "Jerry who lives with Auntie Porsha," T was able to identify Butcher in the courtroom.

{¶ 15} Dr. Stephanie Dewar, a pediatrician from Tod Children's Hospital in Youngstown, Ohio, testified for the state. Dr. Dewar is also the Medical Director of the Child Advocacy Center, which examines children in cases of suspected child abuse. Dr. Dewar examined both girls on November 25, 2003.

{¶ 16} Dr. Dewar testified as to what had been reported to her by the children, Mary Beth, and Bethany, and also regarding the results of each child's physical examination. Dr. Dewar testified that her examination of D revealed an anal fissure, normally not present, and a flattening out of the folds in the anal area. T's physical examination revealed similar results. Dr. Dewar noted that these results were considered "consistent with anal penetration," but "not diagnostic" of it. Dr. Dewar testified that her "impression after evaluation * * * was that there were physical findings present and evaluation was consistent with sexual abuse."

{¶ 17} Butcher testified in his own defense that on the date in question, he took his son Jared to a Little League double-header in Andover, Ohio. This testimony was corroborated by defense witness Tim Lesperance, who testified that Butcher and Jared were at the games until some time between 2:30 and 3:30 p.m. Following the games, Butcher testified that he and Jared went to Ashtabula Mall to have something to eat and returned home prior to Turner's returning home with Corey and Kaylee. Butcher then testified that Turner took Corey and Kaylee to Walmart to spend some of Kaylee's birthday money on presents, leaving him alone in the house with Jared. Butcher testified that T and D did not spend the night at his house and denied that he had anything to do with the alleged acts.

{¶ 18} The jury returned guilty verdicts on all five counts of the indictment. Upon sentencing, the trial court determined that the kidnapping counts were allied offenses of similar import and merged them with the rape counts. Butcher was sentenced to three mandatory life terms on the rape counts, to be served concurrently.

{¶ 19} Butcher has timely appealed the trial court's judgment to this court. He raises two assignments of error for our review. His first assignment of error is:

{¶ 20} "The trial court erred to the prejudice of the appellant in admitting hearsay statements which did not fall within any exception to the prohibition of Evid.R. 802 against their admissibility."

{¶ 21} Butcher challenges the admissibility of certain testimony from Mary Beth, claiming it contained hearsay statements that are not subject to any exception and, therefore, should have been excluded. Butcher maintains that the failure to exclude these statements was prejudicial error warranting reversal of his convictions.

{¶ 22} "The admission of evidence lies within the broad discretion of a trial court, and a reviewing court should not disturb evidentiary decisions in the

absence of an abuse of discretion that has created material prejudice."[1] "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."[2]

{¶ 23} Part of Mary Beth's testimony during direct examination related to statements the girls made when they initially reported the abuse to her. The record reveals that the trial court admitted, over the objections of Butcher's defense counsel, such statements as "Jerry was sexing with them," "he put his man thing in [them]," that the incident occurred "at Jerry's house," and that "Jerry would be mad at [them] because he'll have to go to jail."

{¶ 24} Evid. R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is inadmissible at trial unless it falls under an exception to the rules of evidence.[3]

{¶ 25} Under Evid.R. 801(A), a statement is defined as an oral or written assertion or other nonverbal conduct of a person "if it is intended by him as an assertion." The declarant is the individual who makes the statement.[4] In the instant matter, the testimony of Mary Beth is unquestionably hearsay as it related to out-of-court statements made *by the girls*, who are the declarants, which were offered to prove the truth of the matter asserted.

{¶ 26} The state counters that even if the statements are hearsay, they are otherwise admissible under the "excited-utterance" exception to the hearsay rule, contained in Evid.R. 803(2). If applicable, the exception is valid regardless of whether the declarant is available as a witness.[5]

{¶ 27} An excited utterance is "[a] statement relating to a startling event or condition made while the declarant is under the stress of excitement caused by the event or condition."[6] The rationale for the admission of these statements is that the shock of the event causes the declarant's reflective process to be halted.

---

1. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 43, citing *State v. Issa* (2001), 93 Ohio St.3d 49, 64, 752 N.E.2d 904.

2. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144.

3. Evid.R. 802.

4. Evid.R. 801(B).

5. Evid.R. 803. See, also, *State v. Bowles* (Apr. 28, 1998), 10th Dist. No. 97APA09–1213, 1998 WL 212868.

6. Evid.R. 803(2).

Thus, the statement is unlikely to have been fabricated and carries a high degree of trustworthiness.[7]

{¶ 28} The state correctly notes that there has been a trend in recent years to liberalize the application of the excited-utterance exception to cases that involve the sexual abuse of children. Regarding declarations that are made by children of tender years, the Supreme Court of Ohio has held, "[E]ach case must be decided on its own circumstances, since it is patently futile to attempt to formulate an inelastic rule delimiting the time limits within which an oral utterance must be made in order that it be termed a spontaneous exclamation."[8]

{¶ 29} In the case sub judice, while it is apparent that the children were still showing the effects of the stress of the event, we cannot conclude that the statements made by the girls were not the result of reflective thought. Mary Beth's testimony clearly establishes that T and D deliberated before they disclosed the alleged sexual assault to her, as evidenced by the children's debating back and forth about which one would tell her before finally agreeing to disclose the information "on the count of three."

{¶ 30} In addition, we note that the girls' statements to Mary Beth did not occur until more than two months after the alleged incident. The Supreme Court of Ohio has held:

{¶ 31} "There is no *per se* amount of time after which a statement can no longer be considered to be an excited utterance. The central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may *not* be a result of reflective thought."[9]

{¶ 32} This court has held that the time gap for a young child may be longer than that of an adult, because a child " 'may be under stress caused by the events for a longer period of time than adults.' "[10]

{¶ 33} While there are some cases supporting the proposition that statements made following a lapse of time of greater than two months from alleged sexual abuse may be admissible as excited utterances, each is distinguishable from the case sub judice. One case was decided based upon the "limited reflective abilities" of the declarant or the character of the statement being "sufficiently

---

7. *State v. Taylor* (1993), 66 Ohio St.3d 295, 300, 612 N.E.2d 316, quoting Staff Note to Evid.R. 803(2), citing McCormick, Evidence, (2d Ed.1972) 706, Section 297.

8. *State v. Duncan* (1978), 53 Ohio St.2d 215, 219–220, 7 O.O.3d 380, 373 N.E.2d 1234.

9. (Emphasis sic.) *State v. Taylor*, 66 Ohio St.3d at 303, 612 N.E.2d 316.

10. (Citation omitted.) *State v. Reed* (May 31, 1991), 11th Dist. No. 89–L–14–130, 1991 WL 95227, at *6.

spontaneous to qualify as admissible hearsay." [11]   Other cases were decided upon a combination of the relative youth of the child and the stress from the "startling event" being not the sexual assault itself, but a subsequent event that caused the "stress of excitement" of the earlier sexual assault to reoccur.[12]

{¶ 34} In the instant case, no such circumstances exist.   It is undisputed that the girls did not disclose any information about the incident to anyone for over two months.   The evidence shows that the girls did not become upset until *after* they had made the announcement to Mary Beth. Additionally, merely being "upset," without more, does not meet the standard of admissibility under Evid.R. 803(2).[13]   The declarations lacked the spontaneous quality necessary for an excited utterance.

{¶ 35} We note that several of the girls' statements to Mary Beth occurred in response to Mary Beth's follow-up questioning to their initial statement.   Regarding the admissibility of an "excited utterance" statement resulting from questioning, the Supreme Court of Ohio has held:

{¶ 36} " 'The admission of a declaration as an excited utterance is not precluded by questioning which:  (1) is neither coercive nor leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the domination of the nervous excitement over the declarant's reflective faculties.' " [14]

{¶ 37} We have concluded that the girls' initial statements were a product of reflective thought and do not qualify as excited utterances.   Therefore, any subsequent statements made to Mary Beth as a result of her follow-up questioning were likewise derivative of the reflective thought process and were not made as a result of the stress of the alleged abuse.

{¶ 38} Accordingly, we conclude that the trial court's admission of Mary Beth's testimony regarding the hearsay statements of the girls was error.

{¶ 39} Butcher's first assignment of error has merit.

{¶ 40} Butcher's second assignment of error is:

---

11.   *State v. Negolfka* (Nov. 19, 1987), 8th Dist. No. 52905, 1987 WL 20211, at *3.

12.   See *State v. Dubose* (Nov. 22, 1989), 8th Dist. No. 56174, 1989 WL 142916, at *2;  and *State v. Kincaid* (Oct. 18, 1995), 9th Dist. Nos. 94CA005942 and 94CA005945, 1995 WL 608407, at *4–6.

13.   *State v. Taylor*, 66 Ohio St.3d at 303, 612 N.E.2d 316.

14.   *State v. Simko* (1994), 71 Ohio St.3d 483, 490, 644 N.E.2d 345, quoting *State v. Wallace* (1988), 37 Ohio St.3d 87, 524 N.E.2d 466, paragraph two of the syllabus.

{¶ 41} "The appellant was denied the effective assistance of counsel, contrary to his rights guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and Section 10, Article I, of the Ohio Constitution."

{¶ 42} Butcher argues that the testimony of Dr. Dewar and Bethany contained inadmissible hearsay statements. He claims that his trial counsel's failure to object to these alleged errors constitutes ineffective assistance of counsel, requiring the reversal of his convictions.

{¶ 43} In *State v. Bradley,* the Supreme Court of Ohio adopted the following test to determine whether counsel's performance is ineffective: "Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." [15]

{¶ 44} Our first inquiry is whether trial counsel's performance fell below an objective standard of reasonable representation for failing to object to the statements. Thus, we will determine whether the testimony of these witnesses contained inadmissible hearsay statements.

{¶ 45} Butcher complains about two statements made by Bethany in response to direct examination. In response to the prosecution's line of questioning about the number of times D had visited Butcher's home, Bethany responded that D had visited the home only twice, the last time being the day of Kaylee's birthday party. When asked why that date stood out in her mind, Bethany's testimony was, "[T]hat was the last time [her] girls were around them and they told [her] mom that [Butcher] had touched [them]." In response to the questioning of the prosecutor related to the reason Bethany sent the girls to see a counselor, she responded, "[B]ecause they said that they had intercourse with Jerry Butcher."

{¶ 46} Regarding the first statement, Bethany testified as to what the girls had told her mother, who had then relayed this information to Bethany. Regarding the second statement, Bethany testified that the "girls said" the statement, but does not indicate to whom the girls made the statement. We will presume this statement was also made to Mary Beth, who relayed it to Bethany. This is because Bethany did not testify that the girls ever directly told her about the alleged events. Moreover, both Mary Beth and Bethany testified that the girls initially told Mary Beth, who relayed the information to Bethany.

---

15. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus, adopting the test set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

**{¶ 47}** Accordingly, to properly review Bethany's in-court testimony, we must engage in a double-hearsay analysis pursuant to Evid.R. 805, which provides that each part of a statement must conform to an exception to the hearsay rules in order for the entire statement to be admissible.[16] Here, there are two levels of potential hearsay. First, the girls made statements to Mary Beth, then Mary Beth relayed those statements to Bethany, and, finally, Bethany testified regarding those statements in court.

**{¶ 48}** An example of double hearsay occurred in the case of *State v. Turvey*.[17] In *State v. Turvey*, the Fourth Appellate District held that the double-hearsay statement, in which the witness testified as to what a child had told the child's mother, was inadmissible.[18]

**{¶ 49}** In *State v. Awkal*, the Supreme Court of Ohio addressed the issue of double hearsay. In that case, the victim's attorney testified as to what the victim had told the attorney regarding a threat from the defendant.[19] The statement from the victim to the attorney was arguably admissible pursuant to Evid.R. 803(3), because it concerned the victim's then-existing mental state.[20] However, the initial statement from the defendant threatening the victim was not admissible.[21] Therefore, the Supreme Court of Ohio held that the attorney's entire testimony on this issue was inadmissible.[22]

**{¶ 50}** In the case sub judice, the statements from Mary Beth to Bethany are arguably not hearsay. This is because the statements were not offered to prove the truth of the matters asserted, i.e., that Butcher had had sexual conduct with the girls, but, rather, were offered to show Bethany's state of mind as to why the date stood out in her mind and why she took the girls to counseling. However, the next level of the statements that needs to be examined is the girls' statements to Mary Beth that Butcher had had sexual conduct with the girls. As noted in our prior analysis, these statements were hearsay, as they were made out of court and sought to prove the truth of the matter asserted. These statements are not admissible under any of the hearsay exceptions. Since the

---

16. See, e.g., *State v. Vinson* (1990), 70 Ohio App.3d 391, 399, 591 N.E.2d 337.

17. *State v. Turvey* (1992), 84 Ohio App.3d 724, 618 N.E.2d 214.

18. Id. at 745–746, 618 N.E.2d 214.

19. *State v. Awkal* (1996), 76 Ohio St.3d 324, 330, 667 N.E.2d 960.

20. Id. at 331, 667 N.E.2d 960.

21. Id.

22. Id.

initial level of the statements was inadmissible, Bethany's entire testimony on this issue was inadmissible.[23]   The bottom line is that Mary Beth's statements as to what the girls told her are inadmissible.   Those same statements do not become admissible when they are relayed to the court through a third party.

{¶ 51} Butcher's trial counsel's performance fell below an objective level of reasonable representation due to counsel's failure to object to Bethany's testimony.   Trial counsel properly objected when Mary Beth testified as to what the girls told her.   It was necessary for counsel to object when Bethany testified as to what the girls told Mary Beth.   These inadmissible hearsay statements directly pertained to the ultimate issue of Butcher's guilt.   Trial counsel should have objected to them.

{¶ 52} Butcher also challenges statements made by Dr. Dewar, including "the children's recitation of the events as well as the identity of their abuser being Mr. Butcher."   In addition, we note that the state introduced copies of the medical reports of Dr. Dewar's examinations of the girls, and these reports were admitted as exhibits.   These reports contain similar hearsay statements regarding the identity of the perpetrator and a description of the events.   The state argues that these statements were made for the purposes of diagnosis and treatment and therefore were admissible under Evid.R. 804.

{¶ 53} The day trial began, defense counsel filed a motion in limine seeking to exclude "all statements made to any * * * social worker, nurse or doctor of the Tri–County Advocacy Center," arguing that the totality of the circumstances supported a conclusion that the children were taken to the center, not for the purposes of diagnosis and treatment, but for the purposes of investigation and prosecution.   The trial court conditionally granted Butcher's motion in limine "depend[ent] upon the evidence establishing a recognized exception to the hearsay rule."

{¶ 54} The granting of a motion in limine alone will not preserve error for review.[24]   Instead, a proper objection must also be made at trial at the time the allegedly inadmissible evidence is introduced.[25]

{¶ 55} We will now turn to whether Dr. Dewar's testimony contained hearsay statements, which should have been objected to.

---

23.   Evid.R. 805.

24.   *State v. Stewart* (Dec. 15, 1997), 4th Dist. No. 96CA18, 1997 WL 766459, at *4, citing *State v. Hill* (1996), 75 Ohio St.3d 195, 202–203, 661 N.E.2d 1068.

25.   Id., citing *State v. Brown* (1988), 38 Ohio St.3d 305, 528 N.E.2d 523, paragraph three of the syllabus and *State v. Grubb* (1986), 28 Ohio St.3d 199, 28 O.B.R. 285, 503 N.E.2d 142, paragraph two of the syllabus.

{¶ 56} Evid.R. 803(4) creates an exception from the hearsay rule for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

{¶ 57} Statements in furtherance of diagnosis or treatment are presumed reliable since the effectiveness of the treatment depends on the accuracy of the information related.[26] "Statements made by a child during a medical examination identifying the perpetrator of sexual abuse, if made for purpose of diagnosis and treatment, are admissible pursuant to Evid.R. 803(4), when such statements are made for the purposes enumerated in that rule."[27] This court has interpreted *State v. Dever*, as follows:

{¶ 58} "[P]ursuant to *Dever*, statements made by a child to a medical professional are not automatically excluded simply because the child did not possess the initial motivation to seek diagnosis or treatment, but rather were directed there by an adult. Once at the medical professional's office, however, it must be established that the child's statements were made for the purpose of medical diagnosis or treatment."[28]

{¶ 59} Unlike adults, young children may not appreciate the medical significance of an interview with a doctor. Thus, in the case of a child of tender years, the Supreme Court of Ohio recommended that trial courts consider, through a voir dire examination of the child, the circumstances surrounding the child's making of the statements to medical personnel before admitting the statements under Evid.R. 803(4).[29] Such circumstances include "the type of environment the child was placed in, the attire of the [interviewer], the presence of other medical professionals, or any other circumstance which would heighten the child's awareness that the questions asked were for the purpose of medical diagnosis or treatment."[30]

{¶ 60} If, after reviewing the applicable circumstances, the trial court concludes that the child's statements to the medical professional were made for

---

26. (Citation omitted.) *State v. Boston* (1989), 46 Ohio St.3d 108, 121, 545 N.E.2d 1220.

27. *State v. Dever* (1992), 64 Ohio St.3d 401, 596 N.E.2d 436, paragraph two of the syllabus.

28. *In re Corry M.* (1999), 134 Ohio App.3d 274, 282, 730 N.E.2d 1047.

29. *State v. Dever*, 64 Ohio St.3d at 410, 596 N.E.2d 436.

30. *State v. Griffith*, 11th Dist. No. 2001–T–0136, 2003-Ohio-6980, 2003 WL 22994540, at ¶ 59.

the purposes of medical diagnosis, the court should admit the statements.[31] "If, however, the trial court does not find sufficient factors indicating that the child's statements were made for the purpose of medical diagnosis or treatment, the statements must be excluded as not falling within the ambit of Evid.R. 803(4)." [32]

{¶ 61} Butcher argues that the aforementioned statements were improperly admitted under Evid.R. 803(4), since the trial court failed to voir dire T and D to establish a foundation for the admission of the testimony. Prior to the second day of trial, the court conducted an in-chambers discussion related to the pending testimony of Dr. Dewar. The court elected to allow Dr. Dewar to testify, despite the fact that no voir dire had been conducted on the children.

{¶ 62} Since no voir dire was conducted, we will examine the surrounding circumstances, as gleaned from the other evidence in the record, to determine whether the record contains sufficient evidence that the girls' statements to Dr. Dewar were made for the purposes of medical diagnosis or treatment.

{¶ 63} Dr. Dewar testified that the identity of an alleged abuser is an important consideration to determine the "risk of transmission of sexually transmitted diseases" and because of "safety issues of the child." Thus, she concluded that a child's identification of the alleged abuser is made for the purposes of medical diagnosis and treatment. However, her testimony is not supported by the facts of this case. The medical reports have a section regarding sexually transmitted diseases. These reports indicate that neither girl was tested for sexually transmitted diseases. If Dr. Dewar was so concerned about sexually transmitted diseases that she needed to ascertain the identity of the alleged perpetrator for this reason, the question that arises is—why were the girls not tested for sexually transmitted diseases?

{¶ 64} It is important to review the facts as to how the children arrived at the Child Advocacy Center. Mary Beth testified that she took the girls to the Ashtabula Clinic in relation to the alleged abuse by Butcher. The girls were examined by a doctor at this facility. Mary Beth testified that she and Bethany were directed to take the girls to see Dr. Dewar by Ashtabula County Children Services Board. Further, Detective Joseph Cellitti of the Ashtabula City Police Department testified for the state. He testified that he did not interview the children in this matter. Instead, he referred them to the Child Advocacy Center for the purposes of an interview and examination.

{¶ 65} Further, the evidence in this matter indicates that the social worker from children services actually went to the Child Advocacy Center. The medical

---

31. *State v. Jett* (Mar. 31, 1998), 11th Dist. No. 97–P–0023, 1998 WL 258166, at *12.

32. Id., citing *State v. Dever*, 64 Ohio St.3d at 410–411, 596 N.E.2d 436.

reports indicate that the social worker was present at the hospital when the girls were examined by Dr. Dewar.

{¶ 66} In this matter, Dr. Dewar amounted to a "manufactured witness" for the state. The girls had already received medical attention from a private doctor for the alleged abuse. They were taken to see Dr. Dewar upon the recommendation of state agents, namely children services and the police. It is readily apparent that Dr. Dewar's primary function was to collect evidence to support a conviction. At trial, even the trial court stated, "I'm telling you [Dr. Dewar] is an advocate[.] * * * [H]er job is to try and get convictions."

{¶ 67} Officer Cellitti specifically testified that he did not interview the children and referred them to the Child Advocacy Center to be interviewed. Thereafter, he testified that he reviewed the reports from the Child Advocacy Center and, based in part upon those reports, determined that Butcher was a suspect in this matter.

{¶ 68} We note that Dr. Dewar testified that she had conducted the interviews with the girls herself. However, a doctor is not permitted, during a medical examination, to assume the role of a police investigator, elicit statements from the alleged victims, and then testify regarding those statements under the guise that they were given for the purpose of medical diagnosis or treatment.

{¶ 69} This court has previously held that although a voir dire of the child is desirable, *Dever* "does not actually mandate a voir dire."[33] However, it is imperative to voir dire the children in a case like this, where the doctor at issue is not the children's regular pediatrician but, rather, is a state-selected child-abuse investigator. Children services, the police, the mother, the grandmother, and the doctor all knew this examination was for the purpose of collecting evidence. How then, can the children be presumed to know that it was for some other purpose?

{¶ 70} Without the benefit of a voir dire examination, the remaining portions of the record do not contain sufficient indicia that the girls' statements to Dr. Dewar were made for the purposes of medical diagnosis or treatment. Thus, Dr. Dewar's testimony contained inadmissible hearsay statements.

{¶ 71} While we have concluded that the statements made to Dr. Dewar were inadmissible because she was, in effect, a "manufactured witness," we recognize that specialized medical professionals such as Dr. Dewar will continue to play an important role in abuse cases. Dr. Dewar's testimony regarding her physical examinations of the girls was relevant and admissible. Our opinion criticizing the use of a "manufactured witness" to introduce a child's quasi-police

---

33. *State v. Cornwell* (Feb. 27, 1998), 11th Dist. No. 95–T–5379.

statement into evidence should not be construed to prohibit the use of a state-selected doctor to obtain forensic or medical evidence to support the state's case. Further, our opinion does not challenge the admission of a child's statement made to a medical provider *if it is demonstrated* that the statement was made for the purpose of medical treatment or diagnosis as permitted by Evid.R. 803(4).

{¶ 72} Trial counsel's performance fell below an objective level of reasonable representation due to counsel's failure to object to the inadmissible hearsay statements in Dr. Dewar's testimony. Since counsel filed a motion in limine on this exact issue, it was inexcusable for counsel to fail to object when Dr. Dewar testified regarding the girls' statements.

{¶ 73} We have found that the performance of Butcher's trial counsel was deficient for failing to object to the hearsay statements in the testimony of Bethany and Dr. Dewar. The next inquiry is whether Butcher was prejudiced by these statements.

{¶ 74} In this matter, Dr. Dewar testified regarding the girls' statements identifying the alleged abuser as Butcher and the narrative background she was given about the incident. This testimony functioned as Dr. Dewar bolstering the girls' testimony and vouching for their credibility.

{¶ 75} As to the testimony from Bethany, we note that it was substantially similar to that of Mary Beth. However, Mary Beth's testimony regarding the girls' statements was inadmissible hearsay. Thus, the inadmissible hearsay was presented to the jury a second time through Bethany's testimony.

{¶ 76} We conclude that Butcher was prejudiced by his trial counsel's failure to object to the inadmissible hearsay statements contained in the testimony of Bethany and Dr. Dewar.

{¶ 77} Butcher's second assignment of error has merit.

{¶ 78} Generally, the improper admission of a single hearsay statement may be considered "harmless" error. This may be especially true when the victim directly testifies to the alleged events. However, the amount of inadmissible hearsay used in this case is significant. Four different adults (Mary Beth, Bethany, Dr. Dewar, and Detective Cellitti) testified that Butcher was the culprit in the offenses. The medical reports also listed Butcher as the alleged perpetrator. In addition, three of the adults (Mary Beth, Bethany, and Dr. Dewar) specifically testified that Butcher had sexual conduct with the girls. Obviously, none of the adults were present at the time the alleged abuse occurred. Therefore, all of these adults formulated their opinions regarding Butcher based on what the girls had told them or other individuals. By definition, these were

hearsay statements. As we have concluded, these hearsay statements do not fall within any hearsay exception.

{¶ 79} We note that the girls testified as to the alleged events. The prejudice arises when numerous adults repeat the girls' stories in court. If a statement is repeated often enough, it is more believable. Additionally, the repetition has the effect of the adults' vouching for the veracity of the statements. For example, members of the jury may think, "If Dr. Dewar believed the girls' statements, maybe we should, too."

{¶ 80} Moreover, certain portions of the girls' testimony was suspect. Specifically, D could not identify Butcher in court. T testified that her aunt, Turner, facilitated the crimes by instructing the girls to go to the room to be alone with Butcher. T testified that D was crying during the incident, but D testified that she did not cry.

{¶ 81} There was evidence regarding the girls' physical injuries. Dr. Dewar testified that the girls' injuries were "consistent with" but not "diagnostic of" sexual abuse. Also, she testified that other things could cause these types of injuries. Accordingly, the medical evidence is equivocal regarding the occurrence of the abuse. More importantly, the medical evidence did not, in any way, link Butcher to the alleged crimes.

{¶ 82} As a result of the numerous hearsay statements presented in this matter, we cannot conclude that Butcher had a fair trial.

{¶ 83} The judgment of the trial court is reversed. This matter is remanded to the trial court for a new trial.

Judgment reversed
and cause remanded.

FORD, P.J., concurs.

GRENDELL, J., dissents.

GRENDELL, Judge, dissenting.

{¶ 84} As an initial matter, I agree with the majority that the admission of Mary Beth Askew's identification testimony of appellant as the perpetrator was hearsay not subject to a recognized exception and therefore, should not have been admitted. However, I do not agree, in the context of the remaining evidence and testimony, that the admission of this statement constituted prejudicial error requiring reversal of appellant's convictions. Accordingly, I respectfully dissent.

{¶ 85} A decision to admit or exclude testimony is a matter within the sound discretion of the trial court and will not be overturned absent a clear abuse of discretion whereby the defendant has suffered *material prejudice*. (Emphasis

added.) *Hores v. Weaver*, 11th Dist. Nos. 2004–T–0045, 2004–T–0047, and 2004–T–0048, 2005-Ohio-6076, 2005 WL 3047498, at ¶ 17, citing *Quinn v. Paras*, 8th Dist. No. 82529, 2003-Ohio-4952, 2003 WL 22146526, at ¶ 31; *State v. Brazzon*, 11th Dist. No. 2001–T–0050, 2003-Ohio-6088, 2003 WL 22697976, at ¶ 13; *State v. Long* (1978), 53 Ohio St.2d 91, 98, 7 O.O.3d 178, 372 N.E.2d 804; *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, at paragraph two of the syllabus. In applying an abuse-of-discretion standard, the appellate court is not free to substitute its judgment for that of the trial court. (Citation omitted.) *In re Jane Doe 1* (1991), 57 Ohio St.3d 135, 137–138, 566 N.E.2d 1181.

{¶ 86} The testimony of Mary Beth Askew was hearsay, not subject to an exception, and admission of that testimony was error. However, the inquiry does not end there. A reviewing court next must determine whether this error is harmless or prejudicial.

{¶ 87} Under Evid.R. 103(A) and Crim.R. 52(A), error is harmless unless substantial rights of the defendant are affected. *State v. Hicks* (Aug. 16, 1991), 6th Dist. No. L–83–074, 1991 WL 156534, at *5. For nonconstitutional errors, the test is whether "there is substantial evidence to support the guilty verdict even after the tainted evidence is cast aside." *State v. Cowans* (1967), 10 Ohio St.2d 96, 104, 39 O.O.2d 97, 227 N.E.2d 201. Where constitutional error in the admission of evidence exists, "such error is harmless beyond a reasonable doubt if the remaining evidence, standing alone, constitutes overwhelming proof of the defendant's guilt." *State v. Williams* (1983), 6 Ohio St.3d 281, 6 OBR 345, 452 N.E.2d 1323, at paragraph six of the syllabus.

{¶ 88} The admission of Mary Beth's hearsay statements of the victims was harmless error under either test. Both of the victims testified as to the events that occurred, and their testimony was in substantial accord with regard to all relevant facts. The victims were subject to cross-examination, and the jury was free to consider the weight and credibility of their testimony. Moreover, the victims' testimony was corroborated by physical evidence "consistent with anal penetration." Dr. Dewar testified that in most cases of alleged sexual abuse, such physical evidence is the exception rather than the rule. Based upon this evidence, even if Mary Beth's testimony had not been admitted, the jury had substantial evidence to convict appellant.

{¶ 89} The same could be said for the statements from Bethany Askew and Dr. Dewar. Interestingly, appellant chooses not to directly challenge the admissibility of the statements of Dr. Dewar and Bethany Askew, instead challenging his conviction on the basis of a claim of ineffective assistance of counsel.

{¶ 90} The United States Supreme Court has adopted a two-part test for determining whether trial counsel was ineffective: "First, the defendant must show that counsel's performance was deficient," meaning that they "made errors

so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. "Second, the defendant must show that the deficient performance *prejudiced the defense.*" (Emphasis added.) Id.

{¶ 91} In Ohio, there exists a strong presumption that a licensed attorney is competent. *State v. Smith* (1985), 17 Ohio St.3d 98, 100, 17 OBR 219, 477 N.E.2d 1128. Reversal of a conviction, therefore, places the burden on the defendant to show that counsel's deficient performance raises a reasonable probability that, *but for counsel's errors, the result of the trial would have been different.* (Citation omitted.) *State v. Bradley* (1989), 42 Ohio St.3d 136, 142, 538 N.E.2d 373.

{¶ 92} Defense counsel made no objection at trial to the testimony of either Bethany or Dr. Dewar identifying appellant as the perpetrator of the sexual abuse.[34] Accordingly, he has waived all but plain error. See *State v. Santiago*, 10th Dist. No. 02AP–1094, 2003-Ohio-2877, 2003 WL 21291025, at ¶ 11 (failure to object to the introduction of hearsay evidence at trial waives all claims of error except plain error).

{¶ 93} Pursuant to Crim.R. 52(B), a plain error or defect affecting substantial rights may be noticed if not brought to the attention of the court. *Long*, 53 Ohio St.2d at 94, 7 O.O.3d 178, 372 N.E.2d 804. Plain error is to be invoked only in exceptional circumstances to avoid a miscarriage of justice. (Citation omitted.) Id.

{¶ 94} The test for plain error is enunciated under Crim.R. 52(B). In order for Crim.R. 52(B) to apply, a reviewing court must find that (1) there was an error, i.e., a deviation from a legal rule; (2) that the error was plain, i.e., that there was an "obvious" defect in the trial proceedings; and (3) that the error affected "substantial rights," i.e., affected the outcome of the trial. (Citations omitted.) *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240.

{¶ 95} With regard to the testimony of Bethany Askew, the majority indulges in a presumption in order to justify its conclusion that the statements were hearsay within hearsay and thus, inadmissible. This conclusion ignores the fact

---

34. With respect to the identification testimony of Dr. Dewar, the trial court conditionally granted a motion in limine excluding these statements "depend[ent] upon the evidence establishing a recognized exception to the hearsay rule." At trial, however, defense counsel made no objection to the admission of this testimony. See, *McCabe/Marra Co. v. Dover* (1995), 100 Ohio App.3d 139, 160, 652 N.E.2d 236 ("a ruling on a motion *in limine* is a tentative, interlocutory, precautionary ruling by a court in anticipation of its ruling on evidentiary issues at trial"); *State v. Stewart* (Dec. 15, 1997), 4th Dist. No. 96CA18, 1997 WL 766459, at *4, fn. 4 (the grant or denial of a motion in limine will not preserve error for review, absent a proper objection made at trial).

that it is an equally reasonable presumption that Bethany, as the children's mother, heard this information directly from the girls and also fails to take into account the context in which the two challenged statements were actually made.

{¶ 96} As the majority correctly states, hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence *to prove the truth of the matter asserted.*" (Emphasis added.) Evid.R. 801(C).

{¶ 97} While on the surface, it may appear that the statements of Bethany Askew are substantially similar to those of her mother, Mary Beth, a review of the first statement reveals that its purpose was *not* to prove the truth of the matter asserted, i.e. that Butcher had intercourse with the girls, but rather to pinpoint the date of D's last visit to Butcher's home. Bethany's second statement presents a closer case. However, even if the second statement was impermissible hearsay, the statement was "merely cumulative and superfluous," with the testimony of her mother and was therefore harmless. *Williams,* 6 Ohio St.3d at 291, 6 OBR 345, 452 N.E.2d 1323.

{¶ 98} With respect to Dr. Dewar's testimony, Evid.R. 803(4) creates an exception from the hearsay rule for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." (Citation omitted.) *State v. Dewar,* 64 Ohio St.3d 401, 406–407, 596 N.E.2d 436. The rule "extends the common-law doctrine to admit statements made to a physician * * * without regard to the purpose of the examination or the need for the patient's history," thus *"enabling the doctor to testify * * * even when no treatment is contemplated."* (Citation omitted and emphasis added.) *State v. Boston* (1989), 46 Ohio St.3d 108, 121, 545 N.E.2d 1220.

{¶ 99} Statements in furtherance of diagnosis or treatment are presumed reliable because the effectiveness of the treatment depends on the accuracy of the information related. Id. Furthermore, "statements made by a child during a medical examination identifying the perpetrator of sexual abuse, if made for the purpose of diagnosis and treatment, are admissible pursuant to Evid.R. 803(4), when such statements are made for the purposes enumerated in that rule." *Dewar,* 64 Ohio St.3d at 414, 596 N.E.2d 436. "[P]ursuant to *Dewar,* statements made by a child to a medical professional are not automatically excluded simply because the child did not possess the initial motivation to seek diagnosis or treatment, but rather were directed there by an adult. Once at the medical professional's office, however, it must be established that the child's statements were made for the purposes of medical diagnosis or treatment." *In re Corry* (11th Dist.1999), 134 Ohio App.3d 274, 282, 730 N.E.2d 1047.

{¶ 100} In the case of a child of tender years, *Dever* recommended that trial courts consider the circumstances surrounding the child's making of the statements to medical personnel before admitting the statements under Evid.R. 803(4). 64 Ohio St.3d at 410, 596 N.E.2d 436. Such circumstances include "the type of environment the child was placed in, the attire of the [healthcare professional], the presence of other medical professionals, or any other circumstance which would heighten the child's awareness that the questions asked were for the purpose of medical diagnosis *or* treatment." (Emphasis added.) *State v. Griffith*, 11th Dist. No. 2001–T–0136, 2003-Ohio-6980, 2003 WL 22994540, at ¶ 59.

{¶ 101} Unlike all of the cases that appellant cites as supporting his argument, Dr. Dewar testified that she had conducted the interviews with the girls herself. Cf. *Corry*, 134 Ohio App.3d at 283, 730 N.E.2d 1047 ("while the white lab coats and medical instruments traditionally seen at a doctor's office *might* signal in a child's mind the seriousness of the situation and the necessity to tell the truth, such as existed in *Dever*, there is no indication that a typically dressed social worker * * * would evoke a similar reaction in the eyes of a child.") (Emphasis sic).

{¶ 102} Moreover, prior to Dr. Dewar's testimony, which related the girls' statements identifying appellant as their abuser, she testified that the identity of an alleged abuser is an important consideration to determine the "risk of transmission of sexually transmitted diseases" and because of "safety issues of the child." During her testimony, Dr. Dewar testified about the procedures she followed while conducting an interview and about her physical examination of each of the girls. Dewar also testified that the examinations were made for the purpose of medical diagnosis.

{¶ 103} A trial court should exclude testimony under the rule of *Dever* "only in cases where there is affirmative evidence of improper motivation." (Citation omitted.) *State v. Sheppard*, 164 Ohio App.3d 372, 2005-Ohio-6065, 842 N.E.2d 561, at ¶ 35.

{¶ 104} Appellant objects to the admission of the aforementioned statements because the trial court failed to voir dire T and D in order to establish a foundation for the admission of the testimony.

{¶ 105} This court has held that although a voir dire of the child is desirable, *Dever* "does not actually mandate a voir dire." *State v. Cornwell* (Feb. 27, 1998), 11th Dist. No. 95–T–5379. Moreover, courts have found that "failure to conduct such a voir dire * * * is not fatal to the admissibility of evidence under Evid.R. 803(4), if the medical professionals and child are available for cross-examination." *Sheppard*, 164 Ohio App.3d 372, 2005-Ohio-6065, 842 N.E.2d 561, at ¶ 36; *State v. Kelly* (1994), 93 Ohio App.3d 257, 264, 638 N.E.2d 153; *State v. Crum* (Oct. 26, 1998), 9th Dist. No. 97–CA–0134, 1998 WL 818055, at *5; *State v. Slane* (Oct. 22,

1999), 6th Dist. No. F–98–020, 1999 WL 961453, at *16–17; *State v. Demiduk* (June 24, 1998), 7th Dist. No. 96–C0–16, 1998 WL 355864, at *5–7. Such was the case here.

{¶ 106} Under the circumstances presented herein, where both victims and Dr. Dewar testified and were subject to cross-examination, *and* where the undisputed physical evidence was consistent with their testimony, I cannot conclude that the admission of the aforementioned testimony was plain error.

{¶ 107} Even if any of the aforementioned statements had been excludable as hearsay, "trial counsel's failure to make objections is within the realm of trial tactics and does not establish ineffective assistance of counsel." (Citation omitted.) *State v. Bradford*, 9th Dist. No. 22441, 2005-Ohio-5804, 2005 WL 2861481, at ¶ 27; see also *State v. Holloway* (1988), 38 Ohio St.3d 239, 244, 527 N.E.2d 831, citing *State v. Lytle* (1976), 48 Ohio St.2d 391, 396–397, 358 N.E.2d 623 ("The failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel. To prevail * * * a defendant must * * * show * * * a substantial violation of any of defense counsel's essential duties * * * and * * * that he was materially prejudiced by counsel's ineffectiveness").

{¶ 108} Here, appellant has failed to demonstrate either a substantial violation of counsel's duties or material prejudice. Since there was no plain error in the admission of the testimony of Bethany Askew or Dr. Dewar, there can be no ineffective assistance claim for failure of defense counsel to object.

{¶ 109} For these reasons, I respectfully dissent. The judgment of the Ashtabula County Court of Common Pleas should be affirmed.