OPINION
{¶ 1} Defendant-appellant, D.H. ("appellant"), appeals from the judgment of the Franklin County Court of Common Pleas, whereby the trial court convicted appellant on two counts of gross sexual imposition, a third-degree felony, in violation of R.C. 2907.05, pursuant to a jury trial.
 {¶ 2} The Franklin County Grand Jury indicted appellant on one count of rape, a first-degree felony, in violation of R.C. 2907.02, and four counts of gross sexual *Page 2 
imposition, third-degree felonies, in violation of R.C. 2907.05. The rape count pertained to K.K., a minor, and the gross sexual imposition counts pertained to K.K. and minors H.H. and D.R. H.H. is appellant's daughter.
 {¶ 3} Appellant pled not guilty to the charges and invoked his right to a jury trial. Before trial, the trial court held a hearing to determine whether H.H. was competent to testify. H.H. was three years old when the sexual abuse occurred, and H.H. was almost five years old during the hearing. At the hearing, the trial court asked H.H. the following:
 Q. * * * Does Lambie [H.H.'s stuffed animal] talk to you?
 A. (The witness nodded her head.) She helps me go to sleep at nighttime.
 Q. Does she?
 A. (The witness nodded her head.)
 Q. How does she do that?
 A. Because sometimes I am scared and she helps me not go in mom's, my mommy's room.
 Q. Okay. And what does she do to help you stay in bed and not go into your mommy's room?
 A. She will say, "Don't go in mommy's room."
 * * *
 Q. * * * [I]s Lambie really saying that?
 A. (The witness shook her head.)
 Q. You just pretend that Lambie is saying that?
 A. (The witness shook her head.) I am having my imagination at nighttime.
 * * * *Page 3 
 Q. Do you know the difference between imaginary things and real things?
 A. (The witness shook her head.)
 Q. No? Do you know what that means?
 A. (The witness nodded her head.)
 Q. But you can't tell those things apart, can you?
 A. (The witness shook her head.)
 * * *
 Q. Do you know what a lie is?
 A. Yes.
 Q. What is a lie?
 A. When I hit someone and say I didn't do it.
 Q. It is when you hit somebody and then you say you didn't do it?
 A. Yes. That is a lie.
 Q. It sure is. And what happens to you when you tell a lie?
 A. I go in time-out.
 * * *
 Q. Have you ever gone to time-out?
 A. (The witness shook her head.)
 Q. Never?
 A. (The witness shook her head.)
 * * *
 Q. If I asked you a question, would you tell the truth or tell a lie? *Page 4 
 A. Truth.
 Q. Why?
 A. Because I don't want to go on time-out ever.
 * * *
 Q. Okay * * * if your mother told you to say something that wasn't true, what would you do?
 A. I don't know.
 Q. Do you think you would say what your mother asked you to say, or would you tell the truth?
 A. To tell the truth.
(Feb. 10, 2006 Tr. at 7-13.)
 {¶ 4} Next, appellant's counsel asked H.H. the following during the hearing:
 Q. At night when Lambie helps you go to sleep, does Lambie talk to you?
 A. (The witness nodded her head.)
 Q. So you hear words come out of Lambie's mouth?
 A. (The witness nodded her head.)
 Q. Okay. Do you talk back to Lambie and you guys have conversations?
 A. (The witness nodded her head.)
 Q. Yes? But you know Lambie is a stuffed animal, right?
 A. (The witness nodded her head.)
(Feb. 10, 2006 Tr. at 13-14.)
 {¶ 5} Next, plaintiff-appellee, the State of Ohio, asked H.H. the following during the hearing: *Page 5 
 Q. * * * When Lambie talks to you, is that pretend or real?
 A. Real.
 Q. So, okay. Even though she is a stuffed animal?
 A. (The witness nodded her head.)
(Feb. 10, 2006 Tr. at 14.)
 {¶ 6} Afterwards, the parties addressed with the trial court H.H.'s competency to testify. Appellee stated:
 * * * I am not even sure where to find an argument there. She did exhibit knowing the difference between a truth and a lie. But clearly she has got other issues, so I will just defer to your judgment on that.
(Feb. 10, 2006 Tr. at 15.)
 {¶ 7} Appellant's counsel argued that H.H. was not competent to testify. The trial court concluded:
 * * * I am not going to find [H.H.] competent to testify as a witness. She had very limited ability to communicate her observations. * * *
 Her ability to recall some prior experiences was extremely limited. Her ability accurately to perceive factual experiences that she has had is very limited. I think she did have some ability to differentiate between truth and falsity, between real and imaginary.
 I know that when you went back and talked about the conversation with Lambie, that she at that point said it was real. But earlier when I talked with her about it, the same thing, she seemed to understand at that point that that was not a real conversation and that Lambie wasn't really talking to her. She switched on that. *Page 6 
 I don't think that she is capable of appreciating the importance of testifying truthfully and I am not sure that she is even capable of testifying.
(Feb. 10, 2006 Tr. at 16-17.)
 {¶ 8} Afterwards, appellant's counsel filed a motion to suppress H.H.'s out-of-court statements. Appellee objected to the motion and planned to introduce into evidence a video recording of H.H.'s interview with a social worker at the Children's Advocacy Center for Medical Diagnosis ("Advocacy Center"). The trial court had not ruled on appellant's motion by the time the trial started. After the trial started, appellant's counsel discussed with appellee and the trial court appellee's plan to introduce the recording into evidence:
 * * * [Appellee] is going to play a DVD of [H.H.'s] interview at [the Advocacy Center].
 * * * [The trial court] did a competency hearing for [H.H] and determined, yes, she is not competent to testify. Then came [State v. Edinger, Franklin App. No. 05AP-31, 2006-Ohio-1527], and the Edinger decision then said, you know what, if it is done for a medical diagnosis, it is allowed to come in. Okay. That much we are all in agreement with, even though we don't like that, we are in agreement with it.
 The issue is, I believe that some type of limiting instruction would be necessary because, normally, if someone is not competent, they can't testify, none of their stuff ever comes in, and in this situation we believe that either a limiting instruction saying, look, the reason you are seeing this is because under the rules of evidence now based on a new case, someone who isn't competent normally isn't allowed to testify and their information is not allowed to go before you, but the law now says this, that is why you are seeing this * * *.
(Vol. I Tr. at 109-110.) *Page 7 
 {¶ 9} The trial court took appellant's request for a limiting instruction under advisement. The trial resumed, and appellee called Diane Lampkins of the Advocacy Center to testify. Lampkins testified to the following. Lampkins is a social worker and forensic interviewer for the Advocacy Center. The Advocacy Center is a division of Children's Hospital and:
 * * * The center has partnerships with Coalition Against Family Violence, Choices, Domestic Violence Center, * * * Healthy Start, Prevent Child Abuse Ohio * * * and we work together to protect families, provide services for families that are in need.
(Vol. I Tr. at 150.)
 {¶ 10} A typical procedure at the Advocacy Center would start with an abused child meeting with a medical assistant, who gathers basic information about the child's health. Meanwhile, Lampkins would speak with the parent or guardian of the child. Lampkins would then interview the child with no one else present in the room. Lampkins would avoid the use of leading or suggestive questions during the interview. After the interview, the child would undergo a medical examination, and Lampkins would share with the medical examiner the information that the child disclosed.
 {¶ 11} Lampkins testified that the medical examiner would "rely" on the statements that the child provided during the interview, and the statements would assist the medical examiner in diagnosing the child. (Vol. I Tr. at 155.) Lampkins also testified that the medical examiner would not reinterview the child because the Advocacy Center strives to "reduce the number of interviews for the children." (Vol. I Tr. at 156.)
 {¶ l2} Lampkins testified that she interviewed H.H. at the Advocacy Center. Lampkins testified that H.H. was three years old when the interview occurred. Appellee *Page 8 
then sought to show the jury Lampkins' recorded interview of H.H. At this point, appellant's counsel renewed his objection to the admission of H.H.'s out-of-court statements, including the admission of the recorded interview. Appellee stated that it was "presenting [H.H.'s out-of-court statements] as an exception to the hearsay rule, that being coming in for medical diagnosis or treatment." (Vol. I Tr. at 159-160.) The trial court allowed the evidence, but issued the following instruction to the jury before appellee played the recording:
 Before you hear the videotape * * * I just want to inform you as follows: [H.H.], whom you heard about and will hear on the videotape, is not available to testify as a witness in this case. The Court has previously found that she is not old enough or sufficiently mature to testify.
 Importantly, you may not consider the unavailability of [H.H.] for any purpose whatsoever.
(Vol. I Tr. at 161.)
 {¶ 13} In the recording, Lampkins stated that she wanted to ask H.H. questions about her body, and Lampkins told H.H. that, after the interview, H.H. would undergo a medical exam with a medical professional. Initially, after Lampkins stated that H.H. would see a medical professional after the interview, H.H. called Lampkins a "doodle" and "macaroni." (State's Exh. 2 [interview recording at counter 13:34 to 13:44].) However, ultimately, H.H. answered Lampkins' questions about her body being sexually abused. Lampkins summarized the interview in a written report on Children's Hospital's forms, wherein Lampkins wrote:
 Asked [H.H.] if she knew why she was talking to me today. [H.H.] did not. Reiterated that my job was to talk to kids about their bodies and make sure their bodies were safe. Asked [H.H.] if anyone had touched or done things to her body. [H.H.] reported "pee pee.["] Asked her to tell me *Page 9 
about pee pee. [H.H.] reported "daddy." Asked her to tell me about this. [H.H.] reported "well he doesn't beat up my pee pee, [K.K.] just said that daddy is beating up my pee pee." Asked [H.H.] to tell me more about what really happened. * * * [H.H.] reported that daddy only tickles her pee pee * * *. [H.H.] reports that daddy tickles under her neck. Asked if they tickled pee pee or bottoms. [H.H.] reported no. * * * Asked what daddy does. "* * * [H]e tickles it, that's not bad." Asked how he does this (she points to her vaginal area moving several fingers). Asked [H.H.] what she has on when he tickles. [H.H.] reports "I have on panties." Asked if he tickles panties. [H.H.] reports that "he takes them off a little, then he tickles it." * * * Asked if she * * * ever tickle daddy's pee pee. [H.H.] reported "no [she and her sister] touch it with our hands and then he moves it[.]" Asked how he moves it. "[H]e takes his hand and moves it and pretend[s] it's a monster * * *." Introduced the adult male anatomical drawing. Asked [H.H.] to identify the monster pee pee. [H.H.] pointed to the penis on the drawing. * * * Asked how she touches daddy's pee pee. [H.H.] touched her vaginal area. [H.H.] talked about saying "rarr" to the monster and that he moves it and he wiggles it all by [itself]. [H.H.] reports that daddy doesn't have on any [underwear] when he does this. Asked if her pee pee wiggled all by itself. [H.H.] stated that no because she doesn't have the same kind of pee pee. * * *
(State's Exh. 1 at 6-7.)
 {¶ 14} Lampkins also stated in the report that "[t]he child was not sure understand [sic] truth." (State's Exh. 1 at 6.) However, Lampkins also stated in the report: "[H.H.'s] disclosure at the [Advocacy Center] was clear, coherent and consistent. The disclosure was made from a child's perspective with vocabulary consistent with the child's developmental age. This child provided contextual and sensorimotor detail as well as verbal interactions." (State's Exh. 1 at 7.)
 {¶ 15} On cross-examination, Lampkins testified that sometimes prosecutors and police watch child interviews at the Advocacy Center on closed circuit television. However, Lampkins testified that her interviews are not "assessing" for criminal *Page 10 
prosecutions. (Vol. I Tr. at 169.) Next, Lampkins provided the following testimony on cross-examination:
 Q. Do you think it is important to ask someone if they understand the difference between the truth or not in an interview?
 A. There are ways to assess for that.
 Q. Did you assess that in this situation?
 A. Actually, she kind of did several things herself that I assessed as her being competent.
 Q. What did you put down of her assessment to understand the truth?
 A. That she didn't understand.
(Vol. I Tr. at 172-173.)
 {¶ 16} Referencing Lampkin's summary of H.H.'s interview, where Lampkins indicated "[t]he child was not sure understand [sic] truth," appellant's counsel elicited the following testimony:
 Q. So you came to the conclusion that she doesn't understand the difference between the truth and a lie, pretend and real, correct?
 A. Actually, I believe it was the dropdown box, the option, the way the template was.
 Q. I am having a hard time with the dropdown box. Part of your function is to determine whether or not a young child understands the difference between the truth and not, reality and pretend, games and nongames. You are telling me all you did was use this dropdown box and came up with, yeah, I don't think she understands truth?
 A. No. I wrote in other summaries things she talked about. She gave instances herself that she was pretending to jump on a trampoline. She demonstrated that in an interview. I didn't feel the need to go through all of that. *Page 11 
 Q. You are telling us you felt she was truthful?
 A. I think she demonstrated several things that showed she was competent for the interview.
(Vol. I Tr. at 173-174.)
 {¶ 17} On re-direct examination, Lampkins testified that the Advocacy Center allows prosecutors, law enforcement, and children services personnel to view the interviews to "reduce[ ] the trauma the child has to experience by being questioned or interviewed multiple times" by such individuals. (Vol. I Tr. at 178.) However, Lampkins emphasized that the prosecutors and detectives do not ask any questions during the interview process at the Advocacy Center.
 {¶ 18} Appellee also called Advocacy Center Nurse Gail Hornor to testify. Nurse Hornor verified that the Advocacy Center is affiliated with Children's Hospital. Nurse Hornor testified about the procedures at the Advocacy Center. According to Nurse Hornor, while a child is being interviewed at the Advocacy Center, "an interdisciplinary team * * * observes the interview via closed-circuit television." (Vol. III Tr. at 334.) Nurse Hornor is one of the individuals who observes the interview. The forensic interview "guides [Nurse Hornor's] exam in that it lets [her] know whether or not [she] need[s] to test the child for sexually transmitted diseases like chlamydia, gonorrhea, HIV, hepatitis B, or syphilis." (Vol. III Tr. at 335.) Thus, after the interview, medical personnel, like Nurse Hornor, would give the child a "head-to-toe physical exam." (Vol. III Tr. at 334.) During the exam, medical personnel look for any signs of trauma. After the exam, Advocacy Center personnel talk with the child's parents. Specifically, Nurse Hornor testified: "I talk to the parents about the results of the physical exam. The *Page 12 
forensic interviewer talks to the parents about the interview, and the mental health specialist talks to the parents * * * about counseling resources." (Vol. III Tr. at 335.)
 {¶ 19} Nurse Hornor then testified as follows about H.H.'s medical exam:
 A. [H.H.] had given a history of digital/genital contact, her father touching her vagina and then having to touch, digital/genital contact the other way, having to touch her father's genitalia.
 *.*.*
 A. There is always the possibility when a finger touches a vagina, it is possible to have physical findings. It is very unlikely. In less than five percent of cases, even with girls who give history of penis touching vagina, you have no physical findings, but that is always possible, so we always check to make sure that their bodies are okay.
 *.*.*
 A. [H.H.'s] exam was normal. The hymen was very smooth and delicate, and the lateral walls, meaning the sides of the hymen — which the hymen is the tissue around the opening to the vagina, and there were no tears, no scars * * *
(Vol. III Tr. at 337-338.) Nurse Hornor stated that she would have expected a normal examination given the type of contact that H.H. described. Nurse Hornor summarized in a report, on Children's Hospital forms, H.H.'s physical examination.
 {¶ 20} K.K. testified as follows on appellee's behalf. K.K. lived near H.H. and appellant's home, and K.K. would often visit the home to play with H.H. K.K. saw appellant touch H.H.'s vagina. H.H. was wearing a leotard, and appellant "just pulled [the leotard] open and touched her." (Vol. I Tr. at 59.) K.K. ultimately clarified during her testimony that H.H. was leaning against appellant's lap while he was touching her. State's Exhibit 4 indicates that K.K. had told the Advocacy Center's forensic interviewer that appellant touched H.H.'s vagina while H.H. was lying naked across appellant's lap. *Page 13 
 {¶ 21} Sha Clark testified on behalf of appellee. Clark testified that she is a forensic interviewer at the Advocacy Center. Clark also testified that she interviewed K.K. at the Advocacy Center. Clark testified that K.K. indicated that she saw appellant touch H.H. and that H.H. was lying naked across appellant's lap. However, according to Clark, K.K. said nothing about H.H. wearing a purple leotard. Clark also testified that she was aware that Franklin County Children Services interviewed H.H. when the sexual abuse allegations first surfaced, and that H.H. denied any sexual abuse during the interview.
 {¶ 22} Afterwards, appellee rested its case-in-chief and submitted exhibits into evidence, including: (1) the recorded interview of Lampkins and H.H.; and (2) Lampkins' summary of the interview. Appellant's counsel again objected to the admission of such exhibits, stating: "We believe that this allows the prosecution to do an end run around the right of confrontation * * * under the guise of a medical diagnosis." (Vol. III Tr. at 360.) In response, appellee again argued that such exhibits were being admitted under the hearsay exception for "the purposes of medical diagnosis and treatment." (Vol. III Tr. at 362.) The trial court overruled the objections and admitted the exhibits into evidence. The trial court explained: "[T]he Court is bound byEdinger, as a decision of the Tenth District Court of Appeals, and whatever questions and concerns I may have about the decision, * * * I will overrule the objection on that basis." (Vol. III Tr. at 361.) Next, appellant's counsel argued for a Crim.R. 29 judgment of acquittal on all the charges, but the trial court denied the motion.
 {¶ 23} In appellant's case-in-chief, appellant testified on his own behalf. Appellant denied sexually abusing H.H. Appellant's wife also testified on appellant's *Page 14 
behalf. Appellant's wife essentially explained that appellant could not have sexually abused H.H. as alleged. At the close of appellant's case, appellant's counsel renewed the Crim.R. 29 motion for acquittal, and the trial court denied the motion.
 {¶ 24} Ultimately, the jury found appellant not guilty of the sexual abuse counts concerning K.K. and D.R., but the jury found appellant guilty of the gross sexual imposition counts concerning H.H. The trial court sentenced appellant accordingly.
 {¶ 25} Appellant appeals, raising three assignments of error:
 I. The trial court violated Defendant's right to confrontation as guaranteed by the Sixth Amendment to the United States Constitution, and Section 10, Article I of the Ohio Constitution, by admitting into evidence the out of court declarations by [H.H.].
 II. The trial court erred in admitting [H.H.'s] out of court declarations contrary to the Rules of Evidence because [H.H.'s] out-of-court declarations at the [Child Advocacy Center] were not admissible under Evidence Rule 803(4).
 III. The trial court erred in overruling Defendant's motion for judgment of acquittal pursuant to Criminal Rule 29.
 {¶ 26} We will address appellant's first and second assignments of error together. In these assignments, appellant contends that the trial court improperly admitted into evidence H.H.'s out-of-court statements to Lampkins. We disagree.
 {¶ 27} First, we address appellant's contention that the trial court improperly admitted into evidence H.H.'s out-of-court statements to Lampkins after finding H.H. incompetent to testify. Evid.R. 601 relates to the general rules of competency and states, in pertinent part:
 Every person is competent to be a witness except:
 (A) * * * [C]hildren under ten years of age, who appear incapable of receiving just impressions of the facts and *Page 15 
transactions respecting which they are examined, or of relating them truly.
 {¶ 28} Here, the trial court admitted H.H.'s out-of-court statements, pursuant to Evid.R. 803(4), even though the trial court found H.H., who was under ten years of age at the time of trial, incompetent to testify at trial. Evid.R. 803(4) states:
 The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
 *.*.*
 (4) Statements for purposes of medical diagnosis or treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.
 {¶ 29} The trial court concluded that it was "bound byEdinger" to admit H.H.'s out-of-court statements, even though it had found H.H. incompetent to testify. (Vol. III Tr. at 361.) State v.Edinger, Franklin App. No. 05AP-31, 2006-Ohio-1527, concerned a trial court admitting into evidence a young child's out-of-court statements to an Advocacy Center social worker. Id. at ¶ 10, 65. In Edinger, the trial court made no Evid.R. 601 determination on the child's competency to testify because the prosecution decided not to have the child testify. Id. at ¶ 4, 65. On appeal, the defendant argued that the trial court abused its discretion by admitting the child's statements to the social worker without first determining the child's competency. Id. at ¶ 65. We rejected the defendant's argument, noting that courts have found that a "child's statements could be admitted pursuant to Evid.R. 803(4) regardless of any ruling on the child's competency." Id. at ¶ 67. *Page 16 
 {¶ 30} Recently, the Ohio Supreme Court held the same in State v.Muttart, N.E.2d, 2007-Ohio-5267. Like Edinger, Muttart involved a case where the trial court admitted into evidence a young child's out-of-court statements to medical personnel, and, in doing so, the trial court made no determination on the child's competency to testify.Muttart at ¶ 20-30. The Ohio Supreme Court upheld the trial court's decision and stated that, "regardless of whether a child less than ten years old has been determined to be competent to testify pursuant to Evid.R. 601, the child's statements may be admitted at trial as an exception to the hearsay rule pursuant to Evid.R. 803(4) if they were made for purposes of medical diagnosis or treatment." Muttart at ¶ 46, citing Ferrell v. Ferrell (Mar. 14, 1986), Huron App. No. H-84-39.
 {¶ 31} The Ohio Supreme Court explained that:
 * * * [A] fundamental assumption underlying the medical-treatment exception is that that particular hearsay is reliable. [State v. Dever (1992), 64 Ohio St.3d 401, 410-411.] "[The] exception is premised on the theory that a patient's statements to her physician are likely to be particularly reliable," United States v. Tome (C.A. 10, 1995), 61 F.3d 1446, 1449, and "carr[y] special guarantees of credibility," White v. Illinois (1992), 502 U.S. 346, 356 * * *.
Muttart at ¶ 39.
 {¶ 32} According to the Ohio Supreme Court, such reliability stems from the medical-treatment exception being based on:
 * * * [T]he belief that the declarant is motivated to speak truthfully to a physician because of the patient's self-interest in obtaining an accurate diagnosis and effective treatment. See State v. Eastham (1988), 39 Ohio St.3d 307, 312 * * * (Brown, J., concurring).
Muttart at ¶ 34. *Page 17 
 {¶ 33} In further discussing the reliability of out-of-court statements under the medical-treatment exception, the Ohio Supreme Court also noted:
 "`The general reliance upon "subjective" facts by the medical profession and the ability of its members to evaluate the accuracy of statements made to them is considered sufficient protection against contrived symptoms. Within the medical profession, the analysis of the rule appears to be that facts reliable enough to be relied on in reaching a diagnosis have sufficient trustworthiness to satisfy hearsay concerns.'" * * *
Muttart at ¶ 41, quoting State v. Dever, 64 Ohio St.3d 401, 411,1992-Ohio-41, quoting 2 McCormick on Evidence (4th Ed. 1992) 250.
 {¶ 34} Muttart emphasized that the above reliability factors behind the medical-treatment exception also apply to young children. Id. at ¶ 47, 49, fn. 6. Indeed, in Muttart, the Ohio Supreme Court acknowledged that "[o]ther courts have found that a child's young age and naivet é may itself be a factor in favor of trustworthiness." Id. at ¶ 49, fn. 6.
 {¶ 35} Thus, Muttart expanded upon Dever, wherein the Ohio Supreme Court held that a young child's statements relating to medical diagnosis or treatment are not "untrustworthy" for the mere reason that "a young child would probably not personally seek treatment, but would generally be directed to treatment by an adult." Dever at 409-410. "Once the child is at the doctor's office, the probability of understanding the significance of the visit is heightened and the motivation for diagnosis and treatment will normally be present. That is to say, the initial desire to seek treatment may be absent, but the motivation certainly can arise once the child has been taken to the doctor." Id. at 410. "Everyday experience tells us most children know that if they do not tell the truth to the person treating them, they may get worse and not better." Id. Thus, "[i]n many *Page 18 
situations, the statements of young children are sufficiently trustworthy and can appropriately be admitted pursuant to Evid.R. 803(4)." Dever at 410.
 {¶ 36} Unlike in Edinger and Muttart, the trial court here found the child incompetent to testify. Regardless, we find such a distinction inapposite. "The judicial determination of legal competency of a child under the age of ten years for trial purposes is a far different consideration than admissibility of hearsay statements of the same child made" during diagnosis and treatment. Ferrell; see, also, In reD.L., Cuyahoga App. No. 84643, 2005-Ohio-2320, at ¶ 27 (following theFerrell rationale). "They are independent matters for consideration."Ferrell. "Under the former, the trial judge must determine whether the child, with appreciation of truthfulness, is able to observe, recollect and narrate to such a degree that he can tell the trier of fact his story subject to rules governing credibility." Id. Conversely, "[t]he rationale behind Evid.R. 803(4) focuses on the patient and bases the trustworthiness of the patient's responses to his strong motive to tell the truth because diagnosis and treatment are dependent upon such a premise." Ferrell. Thus, in In re D.L., the Eighth District Court of Appeals upheld a trial court's decision to admit, under Evid.R. 803(4), a young child's out-of-court statements even though the trial court had found the child incompetent to testify. See, e.g., In re D.L.
 {¶ 37} Given the above, we conclude that a trial court's determination that a child under ten years of age is incompetent to testify does not, by itself, undermine the child's out-of-court statement or the admissibility of the statement under Evid.R. 803(4). Thus, applyingEdinger and Muttart here, we find that the statements of a child under ten *Page 19 
years of age can be admitted under Evid.R. 803(4), irrespective of any ruling on the child's competency.
 {¶ 38} We next consider whether H.H.'s out-of-court statements were admissible under Evid.R. 803(4). The admission of evidence lies within the broad discretion of a trial court, and a reviewing court should not disturb evidentiary decisions absent an abuse of discretion. State v.Noling, 98 Ohio St.3d 44, 2002-Ohio-7044, at ¶ 43. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 39} In Edinger, we concluded that Evid.R. 803(4) can apply to a child's statements to a social worker at the Advocacy Center, which is part of Children's Hospital. Edinger at ¶ 63-64. Specifically, we recognized that the social worker's interview with the child is conducted for purposes of medical treatment and diagnosis. Id. at ¶ 63. The testimony here reconfirms those conclusions. Specifically, here, Lampkins testified that, after her interview with a child, she shares the child's responses with a medical examiner of the Advocacy Center who was to examine the child. Similarly, Nurse Hornor testified that the interview with the social worker guided her medical examination of the abused child.
 {¶ 40} In so concluding, we recognize that the Eleventh District Court of Appeals refused to apply Evid.R. 803(4) to a child's out-of-court statements to medical personnel at a similar facility upon concluding that the medical personnel at such a facility are "`manufactured witnesses]' for the state * * * [whose] primary function was to collect evidence to support a conviction." State v. Butcher, 170 Ohio App.3d 52, 2007-Ohio- *Page 20 
118, at ¶ 66. However, we disagree with such an assessment, given our recognition in Edinger that the Advocacy Center is a part of Children's Hospital and that the Advocacy Center "is neither run by nor managed by any government officials. In fact, * * * its employees are employees of Children's Hospital. Further, * * * the function of the [Advocacy Center's] social worker was solely for medical diagnosis and treatment. The documents prepared relative to [a child's] examination and interview[s] [are] all completed on forms provided by Children's Hospital." Edinger at ¶ 78.
 {¶ 41} In further disagreeing with Butcher, we acknowledge that, although law enforcement personnel may watch a child's interview, such personnel do not control the process. However, officers are not "overtly present and the child [is] not made aware of their presence."Edinger at ¶ 82. As an example, Lampkins testified that prosecutors and detectives do not ask any questions during her interview process, prosecutors and detectives are not present in the room of the interview, and Lampkins does not use her interviews to assess for criminal prosecutions.
 {¶ 42} Concluding that Evid.R. 803(4) can be applied to a child's statements to a social worker at the Advocacy Center, we next consider whether circumstances exist to make H.H.'s out-of-court statements to Lampkins admissible under Evid.R. 803(4). As indicated above, in regards to cases involving an out-of-court statement for purposes of medical diagnosis or treatment, "the question is not whether the statement is reliable; the presumption is that it is." Muttart at ¶ 47. "The salient inquiry here is not [the child's] competency but whether her statements were made for purposes of diagnosis and treatment rather than for some other purpose." Id. *Page 21 
 {¶ 43} "The trial court's considerations of the purpose of the child's statements will depend on the facts of the particular case."Muttart at ¶ 49. Considerations for the trial court include, at a minimum:
 * * * (1) [W]hether the child was questioned in a leading or suggestive manner * * *; (2) whether there is a motive to fabricate, such as a pending legal proceeding such as a "bitter custody battle," * * *; and (3) whether the child understood the need to tell the physician the truth * * *
Id.
 {¶ 44} "In addition, the court should be aware of the manner in which a physician or other medical provider elicited or pursued a disclosure of abuse by a child victim, as shown by evidence of the proper protocol for interviewing children alleging sexual abuse." Id. at ¶ 49, citingState v. Gersin, 76 Ohio St.3d 491, 1996-Ohio-114.
 {¶ 45} Likewise, "the court may be guided by the age of the child making the statements, which might suggest the absence or presence of an ability to fabricate, and the consistency of her declarations." Id., citing Broderick v. King's Way Assembly of God Church (Alaska 1991), 808 P.2d 1221, 1219-1220.
 {¶ 46} Utilizing the above-noted considerations, we conclude that the facts of this case establish that H.H. made statements to Lampkins for purposes of medical diagnosis and treatment, and we may infer that H.H. was sufficiently aware of such. Specifically, H.H. made statements to Lampkins upon Lampkins informing H.H. that Lampkins'"job was to talk to kids about their bodies and make sure their bodies were safe" and upon Lampkins telling H.H. that, after their discussion, H.H. would undergo a medical exam with medical personnel. (State's Exh. 1 at 6.) We acknowledge that H.H. initially provided a non sequitur in response to Lampkins' indications about the medical *Page 22 
examination. Yet, we find it significant to our analysis that, after Lampkins provided the above information about the interview, H.H. ultimately answered Lampkins' questions in regards to the well being of her body. We also recognize Lampkins testified that, as a forensic interviewer, she avoids the use of leading or suggestive questions, and we find nothing in the record to indicate that Lampkins unduly influenced H.H.'s statements during the interview. Likewise, the record does not suggest that H.H. had a motive to fabricate. We note that appellant's wife raised doubts about the allegations, thereby confirming that appellant's wife was not fostering H.H.'s allegations or using them to her advantage.
 {¶ 47} We also reject appellant's assertions that H.H. "did not know the difference between truth and falsity and had a difficult time distinguishing fantasy from reality." At the competency hearing, the trial court concluded that, despite H.H.'s inability to testify at trial, "I think she did have some ability to differentiate between truth and falsity, between real and imaginary." (Feb. 10, 2006 Tr. at 16.) Likewise, Lampkins ultimately concluded that H.H. "demonstrated several things that showed she was competent for the interview." (Vol. I Tr. at 174.)
 {¶ 48} For these reasons, we conclude that the trial court did not abuse its discretion in admitting, under Evid.R. 803(4), H.H.'s out-of-court statements to Lampkins. We next address appellant's contention that the trial court violated appellant's right to confront witnesses as guaranteed by the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution when the trial court admitted these statements into evidence. *Page 23 
 {¶ 49} The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." The Sixth Amendment is made applicable to the states through the Fourteenth Amendment of the United States Constitution. Pointer v. Texas (1965), 380 U.S. 400,403-406. In Crawford v. Washington (2004), 541 U.S. 36, 59, 68-69, the United States Supreme Court held that, to conform with a defendant's federal confrontation rights, the "testimonial" statements of a witness absent from trial shall only be admitted into evidence against the defendant when the witness is unavailable to testify and when the defendant has had a prior opportunity to cross-examine the witness. Pursuant to Crawford, the Confrontation Clause only implicates testimonial statements. Muttart at ¶ 59; Davis v. Washington (2006), 126 S.Ct. 2266, 2273, ___U.S.
 {¶ 50} In Crawford, the United States Supreme Court expressly declined to "spell out a comprehensive definition of `testimonial.'" Id. at 68. However, the United States Supreme Court held that the term "testimonial" covers, at a minimum, "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Id. Likewise, the United States Supreme Court gave three examples of "formulations" for "`testimonial' statements" that historical analysis supports. Crawford at 51-52; State v. Stahl,111 Ohio St.3d 186, 2006-Ohio-5482, at ¶ 19. The first deems testimonial all "`ex parte in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially.'" Crawford at 51, quoting Crawford's brief;Stahl *Page 24 
at ¶ 19. The second includes all "`extrajudicial statements * * * contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.'" Crawford at 51-52, quoting White v.Illinois (1992), 502 U.S. 346, 365; Stahl at ¶ 19. The third includes "`statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" Crawford at 52, quoting Amici Curiae brief; Stahl at ¶ 19.
 {¶ 51} "In determining whether a statement is testimonial for Confrontation Clause purposes, courts should focus on the expectation of the declarant at the time of making the statement; the intent of a questioner is relevant only if it could affect a reasonable declarant's expectations." Stahl, paragraph two of the syllabus. Moreover, courts should view a declarant's statements objectively when determining whether the statements implicate confrontation clause protection pursuant to Crawford. Stahl at ¶ 22.
 {¶ 52} In Muttart, the Ohio Supreme Court held that statements made to medical personnel for purposes of diagnosis or treatment are not inadmissible under Crawford because they are not even remotely related to the evils which the Confrontation Clause was designed to avoid.Muttart at ¶ 63. In Edinger, we deemed non-testimonial forCrawford purposes a child's out-of-court statements made to an Advocacy Center social worker for medical diagnosis and treatment. Id. at ¶ 82. We reaffirm that conclusion here. In Edinger, we stated that:
 * * * (1) The social worker was not a governmental officer or employee [but] an employee of the [Advocacy Center], which is part of Children's Hospital. * * * (2) The social worker [interviewed the child] for medical treatment and diagnosis and not to develop testimony for trial. (3) The forms used [for the interview] were prepared by the hospital and the *Page 25 
social worker did not act at the direction of the police. (4) Although the police were permitted to watch the interview, they did not control the process. (5) The police were not overtly present and the child was not made aware of their presence. * * *
Id. at ¶ 82.
 {¶ 53} As indicated above, the evidence here supports such determinations. Thus, based on such determinations, and pursuant toStahl and Muttart, we conclude that an objective examination of H.H.'s out-of-court statements and the surroundings in which H.H. made those statements establishes that one could reasonably conclude that the interview with Lampkins was for medical diagnosis and treatment, and not for the availability of a criminal trial. "The fact that the information gathered by the medical personnel in this case was subsequently used by the state does not change" such a conclusion. Muttart at ¶ 62. Accordingly, we conclude that H.H.'s statements to Lampkins were non-testimonial.
 {¶ 54} Therefore, we conclude that the trial court did not violate appellant's Sixth Amendment confrontation rights when it admitted into evidence H.H.'s out-of-court statements.
 {¶ 55} Next, we note that, in his first assignment of error and in oral argument, appellant references the Confrontation Clause in Section10, Article I of the Ohio Constitution, which states: "In any trial, in any court, the party accused shall be allowed to * * * meet the witnesses face to face." In State v. Storch, 66 Ohio St.3d 280, 291,1993-Ohio-38, the Ohio Supreme Court stated:
 * * * "The admission into evidence of a hearsay statement pursuant to a firmly rooted hearsay exception does not violate a defendant's right of confrontation" under the Sixth Amendment as that federal right is defined by the *Page 26 
United States Supreme Court. Dever, supra, at paragraph three of the syllabus. However, the admission may violate our state constitutional right of confrontation. * * *
 {¶ 56} The Ohio Supreme Court explained:
 * * * We construe the right to confrontation contained in Section 10, Article I to require live testimony where reasonably possible. However, circumstances may exist where the evidence clearly indicates that a child may suffer significant emotional harm by being forced to testify in the actual presence of a person he or she is accusing of abuse. In such circumstances, the child may be considered unavailable for purposes of the Rules of Evidence and the out-of-court statements admitted without doing violence to Section 10, Article I * * *
Storch at 315.
 {¶ 57} In Edinger, we recognized that Storch considered the admission of statements under Evid.R. 807, and we called into question the applicability of Storch to cases, like this one, where out-of-court statements were properly admitted under Evid.R. 803(4). SeeEdinger at ¶ 83-84. We note, too, that appellant provides no supporting argument or case law regarding whether the admission of non-testimonial, out-of-court statements from a witness deemed unable to testify at trial implicates Ohio's constitutional confrontation clause. Therefore, pursuant to App.R. 12(A)(2), we decline to address the argument any further.
 {¶ 58} For all of these reasons, we uphold the trial court's decision to admit into evidence H.H.'s out-of-court statements to Lampkins. Accordingly, we overrule appellant's first and second assignments of error.
 {¶ 59} In his third assignment of error, appellant contends that the trial court erred by denying his Crim.R. 29 motion for acquittal at the close of appellee's case-in-chief. We disagree. *Page 27 
 {¶ 60} A trial court grants a Crim.R. 29 motion for acquittal if the evidence is insufficient to sustain a conviction. City of Columbus v.Myles, Franklin App. No. 04AP-1255, 2005-Ohio-3933, at ¶ 17; State v.Woodward, Franklin App. No. 03AP-398, 2004-Ohio-4418, at ¶ 11; Crim.R. 29. Conversely, a trial court shall not grant a motion for acquittal if reasonable minds can reach different conclusions as to whether the prosecution has proved each material element beyond a reasonable doubt.Woodward at 11; Myles at ¶ 17. In considering a motion for acquittal, the trial court must construe the evidence in a light most favorable to the prosecution. Myles at ¶ 17; Woodward at ¶ 11.
 {¶ 61} We apply de novo review to the trial court's decision on a Crim.R. 29 motion for acquittal. Myles at ¶ 18. We will only reverse a trial court's decision to deny a motion for acquittal if, after viewing the evidence in a light most favorable to the prosecution, we conclude that reasonable minds could only reach the conclusion that the evidence failed to prove all the elements of the crime beyond a reasonable doubt. Id.
 {¶ 62} A motion for acquittal focuses on the legal sufficiency of the evidence, not its weight or credibility. Myles at ¶ 19; State v.Harcourt (1988), 46 Ohio App.3d 52, 56; State v. Dunaway (Feb. 18, 1997), Butler App. No. CA96-08-152. Therefore, in reviewing a trial court's decision to deny a motion for acquittal, "`our analysis of the evidence focuses not upon its weight or credibility, * * * but rather its quantitative sufficiency to establish beyond a reasonable doubt each element of the offense.'" State v. Jackson (Feb. 20, 2001), Franklin App. No. 00AP-183, quoting State v. Kline (1983), 11 Ohio App.3d 208,213; Myles at ¶ 19; see, also, State v. Carlisle (Oct. 7, *Page 28 
1997), Lawrence App. No. 97 CA 13, citing State v. Thompkins,78 Ohio St.3d 380, 386, 1997-Ohio-52 (acknowledging that the appellate court does not address the issue of whether it should believe the evidence when reviewing the sufficiency of such evidence).
 {¶ 63} Appellant was charged with two counts of gross sexual imposition concerning H.H. R.C. 2907.05, in pertinent part, defines "gross sexual imposition" as follows:
 (A) No person shall have sexual contact with another, not the spouse of the offender; * * * when any of the following applies:
 * * *
 (4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.
R.C. 2907.01(B) defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."
 {¶ 64} Here, appellee alleged that appellant engaged in two counts of gross sexual imposition involving H.H., a child under 13 years of age. Specifically, appellee alleged that appellant touched H.H.'s vagina and caused H.H. to touch his penis, both for appellant's sexual gratification. Appellant argues that he was entitled to a Crim.R. 29 judgment of acquittal at the close of appellee's case-in-chief because H.H.'s statements were inadmissible, and insufficient evidence existed to support appellant's convictions absent H.H.'s statements. *Page 29 
 {¶ 65} However, we have concluded that H.H.'s statements were admissible. Thus, examining the evidence at trial, we conclude that K.K.'s testimony and H.H.'s out-of-court statements to Lampkins were sufficient to establish that appellant touched H.H.'s vagina and that he caused H.H. to touch his penis.
 {¶ 66} We next examine whether the evidence was sufficient to establish that the above contact was made for the purpose of sexually arousing or gratifying appellant. A trier of fact may infer that a defendant was motivated by desires for sexual arousal or gratification from the "type, nature and circumstances of the contact, along with the personality of the defendant." State v. Cobb (1991), 81 Ohio App.3d 179,185. Here, K.K.'s testimony and H.H.'s out-of-court statements were sufficient to establish that appellant touched H.H.'s vagina after pulling down H.H.'s clothes, and appellant caused H.H. to touch his penis while he was naked. Appellant's contact with H.H.'s vagina included tickling, and when appellant caused H.H. to touch his penis, appellant would also "move[ ]" and "wiggle[ ]" his penis with his hands. (State's Exh. 1 at 6-7.) Viewing such evidence in a light most favorable to the prosecution for the purposes of Crim.R. 29, we conclude that appellee submitted sufficient evidence to establish that the contact involving H.H. was for the purpose of sexually arousing appellant.
 {¶ 67} For these reasons, we conclude that appellee presented sufficient evidence to establish that appellant engaged in two counts of gross sexual conduct. Thus, we conclude that the trial court did not err by denying appellant's Crim.R. 29 motion at the close of appellee's case-in-chief, and we overrule appellant's third assignment of error. *Page 30 
 {¶ 68} In summary, we overrule appellant's first, second, and third assignments of error. Accordingly, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
P. BRYANT and T. BRYANT, JJ., concur.
T. BRYANT, J., retired of the Third Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution. *Page 1