[Cite as *State v. Shutes*, 2018-Ohio-2188.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 105694**

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**ASHLEY SHUTES**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-608603-A

**BEFORE:** Keough, J., Boyle, P.J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** June 7, 2018

**ATTORNEY FOR APPELLANT**

David L. Doughten
David L. Doughten Co., L.P.A.
4403 St. Clair Avenue
Cleveland, Ohio 44103


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
By: Daniel A. Cleary
Assistant County Prosecutor
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113


KATHLEEN ANN KEOUGH, J.:

{¶1} Defendant-appellant, Ashley Shutes, appeals from the trial court's judgment, rendered after a jury verdict, finding her guilty of murder and felonious assault and sentencing her to life in prison, with the possibility of parole after 15 years. For the reasons that follow, we affirm.

## I. Facts and Procedural History

{¶2} In August 2016, Ashley was indicted in a multicount indictment as follows: Count 1, aggravated murder in violation of R.C. 2903.01(A); Count 2, murder in violation of R.C. 2903.02(B); Count 3, murder in violation of R.C. 2903.02(A); Count 4, felonious assault in violation of R.C. 2903.11(A)(1); Count 5, felonious assault in violation of R.C. 2903.11(A)(2);

Count 6, aggravated vehicular homicide in violation of R.C. 2903.06(A)(2); and Count 7, tampering with evidence in violation of R.C. 2921.12(A)(1).

{¶3} The charges stemmed from an incident on May 28, 2016, when Ashley struck her husband, Ronrico Shutes, with her vehicle in the driveway of their home. Ronrico died 13 days later as a result of his injuries. Ashley pleaded not guilty, and the case proceeded to trial. The state's theory at trial was that Ashley hit Ronrico deliberately. The defense argued it was an accident.

{¶4} Cleveland Police Officer Ryan Corrigan testified at trial that a little before midnight on May 28, 2016, he and his partner Brian Soucek responded to a call that a male had been struck by a vehicle on East 138th Street in Cleveland. Ashley, two children, paramedics, firemen, and a neighbor were at the scene when they arrived.

{¶5} Corrigan and Soucek activated their body cameras when they pulled up. As video footage from Corrigan's body camera was played for the jury, Corrigan described what happened upon their arrival. He identified Ronrico, the victim, who was lying on the ground at the end of the driveway. He spoke to Ashley, who told him that she and Ronrico had been arguing, and when she got into her Chevy Tahoe and began to back out of the driveway to leave, Ronrico ran out to stop her. Ashley said she did not see him behind the vehicle and ran him over as she backed out of the driveway. Corrigan said the two children, who he described as "hysterical," told him that Ashley and Ronrico had been arguing, and then Ashley "ran him over" when Ronrico was in front of the vehicle. Corrigan stated that when Ashley later offered to take the children home, they told her they did not want to get in the car with her.

{¶6} Officer Soucek testified that Ronrico was lying on his back at the end of the driveway, with his head toward the garage and feet toward the street. He only had shorts on; he

did not have a shirt or shoes on. Soucek testified that he noticed that part of the front bumper on the SUV was off and there were "fresh-like hand marks on the back of the truck."

{¶7} Officers Corrigan and Soucek decided that the incident had been an accident. The accident report written by Corrigan indicated that Ronrico was standing behind the vehicle when Ashley backed up and ran him over. The officers concluded that the front bumper damage occurred when she backed completely over Ronrico, who was 6'2" and weighed 325 lbs.

{¶8} Leroy Piper, one of the EMS technicians who responded to the scene, testified that in the ambulance on the way to hospital, Ronrico told him he had been drinking that evening, and that he was behind the SUV when he was run over. Piper identified himself on Corrigan's body camera video pointing out damage on the SUV to the police, including damage to the underside of the front bumper and what he called a "nice round indentation" on the front of the bumper. Piper agreed that his assessment of the incident, as documented in the EMS report regarding the call, was that Ronrico had been run over by a vehicle going in reverse.

{¶9} Charlotte Shutes, Ronrico's mother, testified that she owned the home on East 138th Street where Ashley, Ronrico, Ashley's son, and Ashley and Ronrico's 8-month-old daughter lived. Charlotte said that Ashley and Ronrico had been married for less than a year.

{¶10} Charlotte testified that she went over to the house on May 28, 2016, around 1 p.m. after receiving a call from Ronrico asking her to come over and take the baby because Ashley had threatened to leave with her. Charlotte said that Ashley and Ronrico were arguing when she arrived, but that the arguing had stopped by the time she left six or seven hours later. Charlotte said that she called Ashley around 10 or 11 p.m. that evening, and Ashley assured her everything was okay. Charlotte said that about a half hour later, she received a phone call from Ronrico, who "was acting hysterical" and told her "this bitch is crazy." Ronrico told Charlotte that

Ashley, who Charlotte could hear yelling in the background, was acting like she wanted to hit him and start a fight, so he was going to bring the children to her house.

{¶11} About half an hour later, one of Ronrico's neighbors called Charlotte and reported an emergency. Charlotte testified that she immediately went to Ronrico's house, and the ambulance was leaving as she arrived. Charlotte said that she and Ashley then drove to the hospital together. According to Charlotte, Ashley told her during the ride that she and Ronrico had been arguing, so she left the house to go to her aunt's house. The aunt was not home so Ashley went back home. Ashley told Charlotte that as she was driving back home, she had an "overwhelming feeling" that something was wrong, but she did not know what it was. Ashley said that when she returned home, she saw Ronrico in the driveway but did not know what had happened to him.

{¶12} Charlotte testified that after waiting approximately an hour and a half, she visited Ronrico in the intensive care unit. She went in alone; Ashley did not go in with her. Charlotte said that Ronrico was "scared" and "in disbelief." Over defense objection, Charlotte testified that Ronrico told her that he and Ashley had been arguing, and she went out to the car. He said that as he was standing in front of the car, Ashley struck him, then backed up and "came full throttle and ran [him] over again," and then dragged him down the driveway. Charlotte testified that Ronrico told her he was not going to say anything to the police and asked her not to tell them either. On cross-examination, Charlotte said that she spoke with her sister D.F. and her friend A.B. the next day about what had happened because Ronrico had told them the same thing.

{¶13} Charlotte testified that her ten-year-old grandson C.S., who was at Ronrico's house on May 28, 2016, came to the hospital the next day to tell her what had happened. On

cross-examination, she denied telling Cleveland police detective Richard Cerny that C.S. did not tell her about what he had seen until after Ronrico's death.

{¶14} Charlotte testified that there were surveillance cameras at the house that showed what was happening in the front room, the kitchen, and the backyard, and that Ashley told her that the surveillance videos would demonstrate that she had done nothing wrong. Charlotte said the cameras were taken down at some point after the incident, however, although she did not know by whom. She said that she was unable to obtain the May 28, 2016 footage from the surveillance company because she did not have the access code.

{¶15} C.S. testified that he went to Ronrico's house the evening of May 28, 2016, for a party. His eight-year-old cousin D.S. was also there. He said that Ronrico and some of his friends were hanging out in the garage drinking beer. Later, after the friends had left, C.S. observed Ashley and Ronrico arguing. C.S. testified that Ashley grabbed her purse and left the house. According to C.S., Ronrico took a bath, and then lay on the floor in the front room in his underwear, playing on his phone. C.S. said that Ashley returned a short time later, threw money in Ronrico's face, and told him she was taking the baby and he would never see her again. C.S. said that Charlotte called Ronrico during the argument and spoke with him; she then called Ashley, who went out the back door and got in the car as she was speaking with Charlotte.

{¶16} C.S. testified that Ronrico then told him that he was going to take him home. He said that Ronrico put a shirt and shoes on and then went out the back door when he heard the car start.

{¶17} C.S. then went into the dining room, which has a window from which one can see the driveway on the side of the house, and a window that faces the back of the house. C.S. testified that as he watched out the window that faces the back of the house, he saw Ronrico

standing in front of the car, and heard him tell Ashley to get out of the car. According to C.S., Ashley then hit Ronrico with the car and knocked him down, and as he tried to get back up, she hit him again. C.S. said that Ronrico's shorts got stuck on the bumper of the car, and he was dragged all the way down the driveway. C.S. testified that the headlights of the car were on, and he could see Ronrico being dragged and could hear him screaming.

{¶18} C.S. said that he ran to the end of the driveway, stood by Ronrico, and yelled for help. The next door neighbors came over and called 911. C.S. testified that when Ashley returned, she jumped out of the car, ran to Ronrico, said "I told you, Ronrico," and then started yelling, "Who did this to my husband?" C.S. testified that when Ashley offered to give him a ride home, he would not get in the car with her because she had just run over his uncle.

{¶19} On cross-examination, C.S. admitted that he wrote a letter to the trial judge in which he gave a different version of what happened. The letter stated, "Ashley was on the phone. Ashley started walking toward the kitchen, and my uncle said let's go, and he started to put on his clothes and he was outside. Ashley was backing up, and in the back of the gate she ran over him and dragged him to the front side of the house."

{¶20} Ronrico's brother Leshawn, who is C.S.'s father, testified that he was in prison on May 28, 2016, and family members called him about the incident. Leshawn immediately called Ashley, who denied intentionally hitting Ronrico.

{¶21} After learning that C.S. had witnessed the incident, Leshawn called him and asked him what happened. On cross-examination, Leshawn admitted that in a phone call with his daughter, he told her that C.S. "got to see your uncle ran over and he playing like he traumatized." He then said C.S. was "a good actor, the tears and all," and commented that "he good as f---, man, how he lie. He got grandma and all them fooled for real."

{¶22} Charlotte testified that despite Ronrico's request, she decided two days before he died to call the police. She testified that she had to call many times, however, and eventually complained to a lieutenant after Ronrico died, before anyone at the police department took any action to investigate the incident.

{¶23} Cleveland police detective Richard Cerny testified that on June 10, 2016, the day Ronrico died, Charlotte called the police asking about an investigation into her son's death. Two and a half weeks later, after obtaining the accident and EMS reports, he spoke with Charlotte, who told him what Ronrico had told her in the hospital.

{¶24} Det. Cerny testified that he interviewed C.S. on June 29, 2016, and that C.S. told him that Ashley hit Ronrico twice. He admitted that he never asked C.S. about the EMS report, which stated that Ronrico said that he was behind the car when he was hit, and he never questioned C.S. as to whether Ronrico was intoxicated.

{¶25} Det. Cerny testified that he then went to the scene, where he took photographs of the house and driveway, which still contained traces of human hair and skin. He testified that these traces were further up the driveway, which indicated to him that Ronrico was attached to the vehicle and dragged while the vehicle was backing out. Det. Cerny admitted that he did not find any tire marks, hair, or skin closer to the garage.

{¶26} Det. Cerny testified that he is a certified accident reconstructionist but said he did not do a full reconstruction of the incident. He testified that he reviewed the videos from Corrigan and Soucek's body cameras, and found it significant in light of his experience that Ronrico's head was toward the garage as he lay in the driveway. According to Det. Cerny, if Ronrico had come out the front door of the house and been hit as he was behind the vehicle, his head should have been facing the street. Det. Cerny testified further that he saw "fresh" damage

to the left front bumper in the video but did not observe any damage to the rear of the vehicle. He testified further that he would expect that someone of Ronrico's size and weight would not pass freely under the vehicle if he were run over backwards. Det. Cerny testified that he believed Ronrico was attached to the vehicle and dragged.

{¶27} Det. Cerny testified that the police body camera videos showed that the garage door was closed, despite Charlotte's testimony that the door was open. He also admitted that if Ashley had come "full throttle" at Ronrico as he stood in front of the car by the garage, as Charlotte had testified, the vehicle would have gone through the garage door. He also admitted that despite Charlotte's testimony that C.S. told her at the hospital the day after the incident what had happened, his report of his interview with Charlotte stated, "Miss Shutes stated she did not want to believe it until her grandson, C.S., told her after Ronrico died that he saw what happened in the driveway."

{¶28} Det. Cerny did not locate the vehicle until July 7, 2016. He never personally inspected the vehicle, but looked at pictures of the vehicle taken by a police investigator. Det. Cerny testified that the pictures showed no damage to the rear of the vehicle, but damage to the left front side, the left front bumper, and the left bottom shroud of the bumper.

{¶29} Det. Cerny said that he never obtained any surveillance video from the cameras at the house because Charlotte told him he needed a code to access the hard drive and that the system only kept information for 30 days.

{¶30} A.P., Ashley's 16-year-old son, testified for the defense. A.P. was aware that a security system with cameras in the living room, kitchen, and the back door had been installed at the house. He said that Ronrico taught him how to use an application on his cell phone to access video from the cameras of both what was happening live and prior recordings.

{¶31} A.P. was not at the house on May 28, 2016, and did not stay there that evening. He said that during the day on May 28, 2016, he checked the back door camera through the phone app and saw Ashley and other people in the backyard. He also saw the Tahoe parked in the driveway about five feet back from the garage. A.P. testified that he checked the phone app again the morning of May 29, 2016, after learning what had happened, but was unable to recover any footage of the incident. A.P. testified that Ashley stayed at her sister's house the night of the incident, and that she never spent another night at the East 138th Street residence.

{¶32} The jury found Ashley not guilty of Counts 1, 3, and 7 (aggravated murder, murder, and tampering with evidence, respectively) but guilty of the other counts. The counts merged for sentencing, and the state elected to proceed with sentencing on Count 2, murder in violation of R.C. 2903.02(B). The trial court sentenced her to life in prison with the possibility of parole after 15 years. This appeal followed.

## II. Law and Analysis

### A. Excited Utterance

{¶33} In her first assignment of error, Ashley contends that the trial court improperly allowed the jury to consider hearsay by finding Charlotte's testimony about what Ronrico told her in the hospital to be an excited utterance.

{¶34} We review a trial court's decision regarding the admissibility of evidence for an abuse of discretion. *State v. Apanovitch*, 33 Ohio St.3d 19, 25, 514 N.E.2d 394 (1987). An abuse of discretion may be found when the trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, 892 N.E.2d 454, ¶ 15 (8th Dist.).

{¶35} Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Such statements are inadmissible unless an exception to the hearsay rule applies. Evid.R. 802. One such exception is an excited utterance, which is defined as "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). "The rationale for the admission of these statements is that the shock of the event causes the declarant's reflective process to be halted. Thus, the statement is unlikely to have been fabricated and carries a high degree of trustworthiness." *State v. Butcher*, 170 Ohio App.3d 52, 2007-Ohio-118, 866 N.E.2d 13, ¶ 27 (11th Dist.).

{¶36} To fall into the exception, four elements must be satisfied: (1) a startling event; and (2) a statement relating to that event; (3) made by a declarant with firsthand knowledge; (4) while the declarant was under the stress of the excitement caused by the event. *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 123. Ashley contends that Ronrico's statement to Charlotte in the hospital was not an excited utterance because it was the product of reflective thought, rather than the stress of excitement caused by the event.

{¶37} A statement may be an excited utterance even if it is not made strictly contemporaneously with the startling event. *State v. Duncan*, 53 Ohio St.2d 215, 219, 373 N.E.2d 1234 (1978). There is no per se length of time after which a statement may no longer be considered to be an excited utterance. *State v. Taylor*, 66 Ohio St.3d 295, 303, 612 N.E.2d 316 (1993). Thus, the passage of time between the event and the statement is relevant but not dispositive. *Id*. "Each case must be decided on its own merits, since it is patently futile to attempt to formulate an inelastic rule delimiting the time limits within which an oral utterance must be made in order that it be termed a spontaneous declaration." *Duncan* at 219-220. The

central requirements are that the statement must be made while the declarant is under the stress of the event, and the statement may not be a result of reflective thought. *Taylor* at 303.

{¶38} Here, it is apparent that Ronrico was no longer under the stress of the event when he told his mother what had happened. The statement was made more than an hour and a half after the event and during that time, Ronrico clearly had time to reflect, as demonstrated by the fact that what he told Piper immediately after the incident was very different from what he told Charlotte over an hour and a half later. Ronrico's request that Charlotte not tell the police what he had told her also demonstrates that he was no longer under the stress or excitement of the incident; rather, he had thought about the possible consequences to Ashley if Charlotte called the police.

{¶39} We reject the state's assertion that Ronrico's statement was an excited utterance because he was paralyzed and in pain in the intensive care unit, and his mother was the "first family member" he had a chance to speak to. Charlotte may have been the first family member Ronrico spoke to in the hospital, but the record reflects that the first person he told what happened was Piper. Presumably Ronrico was suffering significant pain immediately after the incident, but at that point, while he was obviously still under the stress or excitement of the incident, he told Piper that he was behind the car when Ashley hit him. Later, after time for reflection, he gave Charlotte a different version of events. Ronrico's statement to Piper was an excited utterance; his statement an hour and a half later to Charlotte was the product of reflective thought.

{¶40} Accordingly, the trial court erred in allowing the jury to consider hearsay. Nevertheless, we find the error to be harmless because it did not contribute to the verdict.

{¶41} Ashley was convicted of murder in violation of R.C. 2903.02(B), which provides that no person shall cause the death of another as a proximate result of committing or attempting to commit a first- or second-degree felony offense of violence, in this case felonious assault in

violation of R.C. 2903.11(A)(1) and (A)(2). She was also convicted of felonious assault in violation of R.C. 2903.11(A)(1), which provides that no person shall knowingly cause serious physical harm to another, and felonious assault in violation of R.C. 2903.11(A)(2), which provides that no person shall knowingly cause or attempt to cause physical harm to another by means of a deadly weapon or dangerous ordnance. Finally, she was convicted of aggravated vehicular homicide in violation of R.C. 2903.06(A)(2)(a), which provides that no person while operating a motor vehicle shall recklessly cause the death of another.

{¶42} Charlotte's testimony that Ronrico told her that Ashley purposely hit him is not relevant to the aggravated vehicular homicide conviction because the mental state for that conviction is recklessness, requiring only "heedless indifference to the consequences" as opposed to a "specific intention to cause a certain result." *Compare* R.C. 2901.22(A) and (C), which define "purposely" and "recklessness."

{¶43} With respect to the murder and felonious assault convictions, we find that C.S.'s testimony is sufficient to prove Ashley's guilt beyond a reasonable doubt. C.S. testified that as Ronrico stood in front of the Tahoe, he saw Ashley hit him with the car and knock him down, and then back up and hit him again as he tried to get up. He testified further that as the vehicle backed up, he saw Ronrico, who was somehow attached to the vehicle, being dragged down the driveway and that he could hear him screaming. This testimony is sufficient to establish that Ashley knowingly caused serious physical harm to Ronrico by means of the Tahoe (the felonious assault convictions) and that the felonious assault was the proximate cause of Ronrico's death (the murder conviction).

{¶44} In addition to C.S.'s testimony, the jury saw the video from officer Corrigan's body camera. The video demonstrated that when the police officers arrived at the scene immediately

after the incident, C.S. was extremely agitated and distraught, and he told the police that Ashley ran over Ronrico. He also can be heard on the video telling Ashley that he would not get in a car with her. Thus, the video footage, which was recorded only minutes after the incident, lends credibility to C.S.'s in-court testimony.

{¶45} Finally, the verdict itself demonstrates that the jury disregarded Charlotte's testimony regarding what Ronrico told her at the hospital. Specifically, the jury found Ashley not guilty of Count 1, aggravated murder in violation of R.C. 2903.01(A), which provides that no person shall purposely and with prior calculation and design cause the death of another.

{¶46} The first assignment of error is overruled.

**B.     Manifest weight of the evidence**

{¶47} In her second assignment of error, Ashley contends that her convictions were against the manifest weight of the evidence.

{¶48} A manifest weight challenge questions the credibility of the evidence presented and whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92265 2009-Ohio-3598, ¶ 12. The weight-of-the evidence standard "addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 388, 678 N.E.2d 541 (1997). The question to be answered is whether there is substantial evidence upon which the factfinder could reasonably conclude that all elements of the crime have been proved beyond a reasonable doubt. *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 81.

{¶49} When considering a manifest weight challenge, a reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a

manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 388. In conducting such a review, this court remains mindful that the credibility of the witnesses and the weight of the testimony is primarily for the trier of fact to assess. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact is best able to view the witnesses, and use its observations of the witnesses' demeanor and gestures in weighing the credibility of the proffered testimony. *Wilson* at ¶ 24. The trier of fact may take note of any inconsistencies and resolve them accordingly, choosing to believe all, none, or some of a witness's testimony. *State v. Young*, 8th Dist. Cuyahoga No. 103551, 2016-Ohio-7477, ¶ 35. Reversal on manifest weight grounds is reserved for the "exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387.

{¶50} Ashley contends that C.S.'s testimony was the key evidence against her, but that in light of many inconsistencies in the evidence, his testimony that she deliberately drove forward to hit Ronrico was not credible. She points out that C.S. admitted on cross-examination that he only told the prosecutor about the alleged second hit the day before his testimony, and that his initial statement to the police indicated that Ashley hit Ronrico once and then he was dragged down the driveway. She also points to the letter C.S. wrote to the trial judge in which he gave a different version of events, stating that Ashley hit Ronrico as she was backing up and then dragged him down the driveway.

{¶51} She further contends that C.S.'s testimony was not credible because if Ashley had hit Ronrico with great acceleration as he was standing in front of the car by the garage door, he would have been knocked back a great distance, and the car would likely have gone through the garage door. There was no evidence that Ashley hit the garage door, however. Further, Det. Cerny said he did not find any tire marks, hair, or flesh on the driveway close to the garage.

{¶52} Ashley further contends that C.S.'s testimony that she said, "I told you Ronrico" and tried to deflect blame when she returned by screaming, "who did this to my husband?" was not credible because the neighbors were there by the time she returned, and no one else reported that she made these statements. She also notes that C.S. said that Ronrico put on a shirt and his shoes before going outside, but it is undisputed that he did not have a shirt or shoes on as he lay in the driveway immediately after he was hit. And she points out that even C.S.'s father was heard on a phone call stating that his son was a "good liar" and "had everyone fooled."

{¶53} Ashley also challenges Charlotte's credibility because her testimony was inconsistent with other evidence. She notes that Charlotte's testimony about what Ronrico allegedly told her in the hospital was inconsistent with what Ronrico told EMS as he was on the way to the hospital. She further notes that Charlotte testified that C.S. told her the day after the accident what he had seen, but told Det. Cerny that C.S. did not tell her about what he had seen until after Ronrico died.

{¶54} Ashley argues that in light of these inconsistencies, C.S. and Charlotte's testimony was "simply not sufficiently credible to have been believed by the jury in finding guilt beyond a reasonable doubt," and that the greater amount of credible evidence supports an acquittal. She notes that the original classification by the police was that the incident was an accident. She argues that the fresh hand prints on the back of the vehicle were consistent with a person being hit as they were behind the vehicle. She further notes that she returned to the scene, rather than fleeing, and was completely cooperative with the police.

{¶55} We are not persuaded, however, that this is the exceptional case where the evidence weighs heavily against a conviction. We agree that there were some inconsistencies in the witnesses' testimony and conflicts in the evidence. This court has found, however, that a

conviction is not against the manifest weight of the evidence solely because the jury heard inconsistent or contradictory testimony. *State v. Rudd*, 8th Dist. Cuyahoga No. 102754, 2016-Ohio-106, ¶ 72, citing *State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38; *State v. Mann*, 10th Dist. Franklin No. 10AP-1131, 2011-Ohio-5286, ¶ 37. The decision whether and to what extent to believe the testimony of a particular witness is "within the peculiar competence of the factfinder, who has seen and heard the evidence." *State v. Johnson*, 8th Dist. Cuyahoga No. 99822, 2014-Ohio-494, ¶ 54.

{¶56} The jury saw state's exhibit No. 64, video footage from Officer Corrigan's body camera when he arrived at the scene immediately after Ronrico was hit. C.S. can be seen on the video telling the officers that Ashley and Ronrico had been arguing, and that Ashley deliberately hit Ronrico and then dragged him down the driveway as she backed up. The jury also heard C.S. on the video telling Ashley he would not get in the car with her because she had just run over his uncle. And they saw Ashley's demeanor, which was eerily calm and inconsistent with that of a wife who has just accidently hit her husband with a car. Furthermore, although C.S. may not have told the prosecutor about the second hit until right before trial, state's exhibit No. 79, a recording of C.S.'s interview with Det. Cerny, demonstrates that he told the detective on June 29, 2016, that Ashley deliberately hit Ronrico two times.

{¶57} The jury also heard Det. Cerny's testimony that in light of his experience as a certified accident reconstruction specialist, it was "significant" that Ronrico's head was toward the garage as he lay in the driveway after the incident. The jury also heard Det. Cerny's testimony that if Ronrico had come out of the front door of the house and been hit as he was behind the vehicle, which Ashley contended was what happened, Ronrico's head should have been toward the street as he lay in the driveway after the accident. Det. Cerny testified further that someone of

Ronrico's size would not have passed freely under a vehicle if he were run over backwards, as the defense asserted. The jury also heard the detective's testimony, based on his years of experience, that he believed Ronrico was hit and then dragged down the driveway.

**{¶58}** Moreover, despite Ashley's assertion that there was "no physical evidence" in this case, the jury saw pictures of the Chevy Tahoe, which had damage to its front bumper, and heard both Det. Cerny and Piper opine that the damage was "fresh." The jury also saw pictures of Ronrico's skin and hair left on the driveway from when he was dragged. And the jury heard recorded phone calls between Ashley and her mother in which they talked about Ashley getting treatment for her "anger issues."

**{¶59}** Weighing the evidence and all reasonable inferences, considering Charlotte and C.S.'s credibility, and resolving the conflicts in the evidence, we do not find that the jury clearly lost its way in convicting Ashley of murder, felonious assault, and aggravated vehicular homicide; the greater weight of the evidence demonstrated that Ashley deliberately hit Ronrico with her car, and then dragged him down the driveway. Accordingly, the second assignment of error is overruled.

**{¶60}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

MARY J. BOYLE, P.J., and
PATRICIA ANN BLACKMON, J., CONCUR