[Cite as *State v. Giauque*, 2023-Ohio-94.]

COURT OF APPEALS
ASHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | : | JUDGES: |
| | : | Hon. Earle E. Wise, P.J. |
| Plaintiff - Appellee | : | Hon. W. Scott Gwin, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | |
| JUSTIN GIAUQUE, | : | Case No. 22-COA-003 |
| | : | |
| Defendant - Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:        Appeal from the Ashland County
Court of Common Pleas, Case No.
20-CRI-152

JUDGMENT:        Affirmed

DATE OF JUDGMENT:        January 12, 2023

APPEARANCES:

For Plaintiff-Appellee        For Defendant-Appellant

CHRISTOPHER R. TUNNELL        DARIN AVERY
Ashland County Prosecuting Attorney        105 Sturges Avenue
Mansfield, Ohio 44903
By: NADINE HAUPTMAN
Assistant Prosecuting Attorney
110 Cottage Street, Third Floor
Ashland, Ohio 44805

*Baldwin, J.*

{¶1}   Justin Giauque appeals his conviction in the Ashland County Court of Common Pleas for two counts of Grand Theft, one under R.C. 2913.02(A)(l) an (B)(2), and one under R.C. 2913.02(A)(3) an (B)(2), both fourth degree felonies; Unauthorized Use of Property, a violation of R.C. 2913.04(A) and 2913.04(F)(3)(c), a fourth degree felony; and Possessing Criminal Tools, a violation of R.C. 2923.24(A) and (C), a fifth degree felony. Appellee is the State of Ohio.

### STATEMENT OF THE FACTS AND THE CASE

{¶2}   Giauque was employed by Jason Enderle as a truck driver during the harvest season in 2019.  The harvest was completed at the end of December and Giauque's employment terminated.  Without the consent of Jason Enderle, Giauque took two gravity wagons from Enderle's storage barn and began transporting corn and soybeans to Centerra, a local vendor.  Enderle discovered the unauthorized use after one of the wagons was damaged and, after review of his inventory, concluded that a large amount of soybeans was taken without his knowledge.  He later discovered that Giauque had sold a similar amount of soybeans to the Centerra and reported the matter to the local authorities who pursued an investigation. That investigation led to the filing of charges and the conviction of Giauque.

{¶3}   Jason Enderle's farm is comprised of 4200 acres and the crops grown include corn and soybeans. During the harvest, each load of grain is weighed and recorded as it is harvested, then dried and stored in bins until it is shipped to a vendor in Fostoria or Bellevue, Ohio.  Enderle did not have any business with Centerra, the vendor that purchased soybeans from Giauque.

**{¶4}** Justin Giauque's father, Brian Giauque, was a friend of Jason Enderle and, in September 2019 he contacted Enderle to recommend Justin for a job during the harvest. Enderle hired Justin Giauque to drive a truck that hauled grain from the fields to storage. The job involved driving a truck loaded with grain to storage, dumping the load and returning the empty truck to the fields to be filled. Four or five trucks were involved in the process running constantly during the day. Justin's other duties included delivering grain to the elevator, greasing the combines or delivering fuel to the combines. Giauque was hired on September 24, 2019 and worked until the harvest was completed on November 27, 2019.

**{¶5}** After the harvest was completed, Enderle was frequently out of state in December, January and February on various business trips, auctions and shows. Enderle confirmed someone was at the farm during the off season, but only from 7:30 a.m. to 4:30 p.m. Giauque contacted Enderle while he was in Alabama and he asked about working in the Spring, but Enderle did not commit to hiring him as they had no need for truckdrivers in the Spring. Enderle remembered that during the conversation that he mentioned that was in Alabama and that the conversation took place in February 2020.

**{¶6}** Karen Russ was driving to a friend's house on February 24, 2020 on an unfamiliar road in the vicinity of the Enderle farm. Fearing that she had missed an intersection, she glanced at her phone and when she looked up, she noticed a vehicle in front of her. She unsuccessfully swerved to miss it, struck it and traveled into a ditch after impact. She called 911 to report the accident, but she had trouble describing her location. She described a man who came from a truck across the road, took her phone and talked with the dispatcher. She did not recognize the man, but not seeing anyone else in the

area, she assumed that it was the driver of the vehicle that she struck. The man who called on her behalf was later identified as Giauque by a deputy who recognized his voice.

{¶7} Giauque dragged a damaged gravity wagon to Earl Stitzlein's farm and asked permission to leave it until he could make arrangements for repair. Stitzlein agreed and though he had no further contact with Giauque, he remembered that the wagon was full of soybeans and that some spilled on the ground.

{¶8} Giauque contacted a local repair shop during the evening of February 24, 2020 seeking a prompt repair of a damaged gravity wagon. The shop sent technicians to make the repair, but the damage was too extensive to make a complete repair at the scene, so the wagon was emptied and transported to the shop for further repairs. The owner of the repair shop agreed to make the repairs, but found that the damage was more extensive than originally believed, so the repair was postponed.

{¶9} The gravity wagon had "Enderle" printed on the side with a phone number and that raised the suspicions of the staff at the repair shop, so they contacted Jason Enderle. Enderle knew that he had stored his gravity wagons for the season, so he thought that there was some mistake. He called an employee to check the barn where the wagons were stored. The employee reported that the wagons were missing and Enderle immediately drove to the repair shop and demanded that they release the wagon to him. They refused, insisting that they could only release it to the person who brought it in for repair, Justin Giauque. While Enderle was arguing with the proprietor, they spotted Giauque's truck towing the second Enderle gravity wagon. Enderle called Giauque and insisted that he bring the wagon to him. He complied and brought the wagon to the repair shop.

{¶10} When he arrived he was subject to a barrage of verbal abuse by an angered Enderle, and, when questioned regarding why he took the wagons, he claimed that he was using it to haul beans for a friend. That friend was never identified. Giauque conceded that the wagons were Enderle's and Enderle took the wagons.

{¶11} Enderle then visited Centerra and discovered that Giauque had sold a lot of soybeans. Enderle called his employee Stephen Beer to check on the bin that contained the Enderle soybeans and he reported that ten to fifteen thousand bushels were missing. Enderle asked for confirmation from Centerra and was told that Giauque had sold ten thousand bushels of beans in loads that were consistent with using the gravity wagons to deliver the beans. The wagons had a capacity of 390 bushels and each delivery involved an amount of approximately 300 bushels. Enderle confirmed a few loads had been taken from the soybean bin, but not enough to deplete it to the extent that he and his employees observed on March 4, 2020.

{¶12} Enderle also found soybeans on the ground around the loading chute on the bean bin as well as tire tracks that he believed matched the tread of Giauque's new truck. The mass of beans in the bin were sloped toward the chute in the bin, further supporting his conclusion that beans had been taken from the bin through that chute.

{¶13} Enderle reported the theft to the local authorities and Detective Aaron Crites of the Ashland County Sheriff's Office was assigned to the case. He contacted Giauque and invited him to offer his version of the facts. Giauque did not appear for an interview, but did deliver six documents to Deputy Crites. Deputy Crites described some of the documents as invoices reflecting purchases or sales by Giauque, but they did not correspond with any of the sales described by the representative from Centerra. Deputy

Crites could not read the balance of the documents and he noted that other documents obtained from Centerra contained print identifying Centerra, but the documents offered by Giauque contained no such text.

{¶14} Appellee discovered that Giauque opened an account at Sutton Bank in November 2019 and, beginning in December 2019, for each sale of corn and soybeans to Centerra from the person identified as Justin Giauque, there was a subsequent deposit in Justin Giauque's bank account by direct deposit that matched the amounts paid to Giauque. The total amount deposited for the purchase of corn and soybeans was $94,920.41.

{¶15} The soybeans found at the Stitzlein farm where the damaged gravity wagon was parked, the beans on the ground near Enderle's storage bin and the beans sold to Centerra all shared a unique DNA marker referenced as Liberty Link suggesting that they all had the same source, but not conclusively establishing that fact.

{¶16} Giauque was indicted on August 13, 2020 and charged with Grand Theft in violation of R.C. 2913.02(A)(1), 2913.02(B)(2) a felony of the fourth degree; Grand Theft in violation of R.C. 2913.02(A)(3), 2913.02(B(2) a felony of the fourth degree; unauthorized use of property in violation of R.C. 2913.04(A), 2913.04(F)(3)(c); a felony of the fourth degree; possessing criminal tools in violation of R.C.2923.24(A), 2923.24(C), a felony of the fifth degree. A jury found him guilty of all charges and he was sentenced to an aggregate prison term of twelve months on the Grand Theft charges, five years community control with relevant terms and ordered to pay restitution to Larry Enderle & Sons Grain, LLC, in the amount of $10,275.00; and to Nationwide Mutual Insurance in the amount of $85,749.10.

**{¶17}** Giauque filed a timely appeal and submitted three assignments of error:

**{¶18}** "I. THE COURT ERRED IN OVERRULING DEFENDANT-APPELLANT'S RULE 29 MOTION TO DISMISS."

**{¶19}** "II. GIAUQUE'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

**{¶20}** "III. THE COURT ERRED IN ADMITTING CERTAIN HEARSAY."

### STANDARD OF REVIEW

**{¶21}** Giauque claims that the trial court erred by refusing to grant his Crim.R. 29 motion and further erred in accepting the verdict because it was against the manifest weight of the evidence. When this court reviews the record to determine if the conviction is against the manifest weight of the evidence, the court functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 547 (1997). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

**{¶22}** This court reviews a denial of a Crim.R. 29 motion for acquittal using the same standard used to review a sufficiency of the evidence claim. *State v. Henderson*, 5th Dist. Richland No. 17CA104, 2019-Ohio-4958, ¶ 15 quoting *State v. Larry*, 5th Dist. Holmes No. 15CA011, 2016–Ohio–829, ¶ 20 quoting *State v. Carter*, 72 Ohio St.3d 545, 553, 651 N.E.2d 965, 1995–Ohio–104. Thus, "[t]he relevant inquiry is whether, after

viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

**{¶23}** Giauque also claims that the trial court committed error by admitting hearsay evidence, but concedes that trial counsel did not object so we are restricted to a review of the record for plain error.

> Pursuant to Crim.R. 52(B), "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." The rule places several limitations on a reviewing court's determination to correct an error despite the absence of timely objection at trial: (1) "there must be an error, i.e., a deviation from a legal rule," (2) "the error must be plain," that is, an error that constitutes "an 'obvious' defect in the trial proceedings," and (3) the error must have affected "substantial rights" such that "the trial court's error must have affected the outcome of the trial." *State v. Dunn*, 5th Dist. No. 2008-CA-00137, 2009-Ohio-1688, quoting *State v. Morales,* 10 Dist. Nos. 03-AP-318, 03-AP-319, 2004-Ohio-3391, at ¶ 19 (citation omitted). The decision to correct a plain error is discretionary and should be made "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Barnes, supra*, quoting *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

*Matter of J.J.*, 5th Dist. Knox No. 22CA08, 2022-Ohio-4196, ¶ 47.

**ANALYSIS**

**I., II.**

**{¶24}** Giauque's contention that the trial court erred by failing to grant his motion to dismiss pursuant to Crim.R. 29 and that the verdict was against the manifest weight of the evidence requires examination of the same facts and application of similar standard of review, so we will consider them concurrently.

**{¶25}** Giauque contends that Appellee failed to present sufficient evidence to convict him of obtaining or exerting control over Enderle's grain without his consent for the purpose of depriving him of that grain. Giauque relies upon his characterization of the state's evidence as proving no beans were missing to support his argument. Giauque points to the witnesses' testimony regarding the capacity of the bin and their estimate of the contents before and after the alleged theft and concludes that the testimony supports only a conclusion that no beans were missing from Enderle's bin. Giauque notes that while Enderle and another witness claim beans are missing from the bin, the testimony of the state's witnesses is inconsistent with a conclusion that beans were removed from the bin.

**{¶26}** The testimony of the witnesses can be interpreted as inconsistent or conflicting, but the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the [trier of fact] may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies *503 do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Craig*, 10th Dist. Franklin No. 99AP–739, 2000 WL 297252 (Mar 23, 2000) quoting *State v. Nivens*, 10th Dist. Franklin No. 95APA09–1236,

1996 WL 284714 (May 28, 1996). Indeed, the [trier of fact] need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver*, 10th Dist. Franklin No. 02AP–604, 2003-Ohio-958, 2003 WL 723225, ¶ 21, quoting *State v. Antill,* 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Burke,* 10th Dist. Franklin No. 02AP–1238, 2003-Ohio-2889, 2003 WL 21291042, quoting *State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist.1992).

**{¶27}** Three witnesses addressed the contents of Enderle's soy bean bin. Kevin Berger examined the bin, took some measurements of the bin and the mass of beans it contained and calculated that it contained 45,773.07 bushels of soy beans. He offered no testimony or opinion regarding the amount of beans that may be missing, but he did confirm that the mass of beans in the bin was sloped in such a way to indicate that beans had been unloaded through the chute in the side of the bin.

**{¶28}** Stephen Beer, an Enderle employee, responded to a compound question and his answer does not clearly describe the amount of beans in the bin at the end of the harvest:

Q So you know how many beans are supposed to be at the end of the harvest, and Bin 3, how much is it supposed to have?

A 73 thousand.

Q 73 thousand?

A Yes.

Q At the end of the harvest in 2019, was that full?

A Yes, it was.

Trial Transcript, p. 261, lines 18-25.

**{¶29}** It is not clear whether Beer was describing the total amount of beans from all sources "at the end of the harvest" when he answered the question or whether he is referring to the capacity of the bin. He confirms that the bin was full, but does not clearly state that it contained seventy-three thousand bushels. The jury was free to resolve this ambiguity by relying on the balance of Beer's testimony and the balance of the evidence in the record.

**{¶30}** Beer described the mass of beans as sloped toward the side chute, indicating that someone had used that chute to unload beans and that that at the end of the season it was full and peaked, suggesting that he had inspected the contents of the bin at the end of the harvest. He confirmed that a few loads had been taken out of the bin previously, and the removal took the peak out of the beans in the bin. He was not asked and did not offer any comment regarding how many bushels of beans were removed when he took a "few loads" from the bin prior to the alleged theft. Beer did conclude that ten or fifteen thousand bushels of the beans had been removed from the bin without his knowledge, causing the slope in the beans within the bin.

**{¶31}** The soy beans that remained in the bin were removed by Enderle and, as they were removed the quantity of beans was measured. The bin contained 26,649.99 bushels of soy beans, a number that Enderle confirmed was approximately ten thousand bushels short of what the bin contained according to calculations made by him over "the whole batch."

**{¶32}** Both Beer and Enderle confirmed that the bin was emptied of ten thousand to fifteen thousand bushels of beans. Beer reached that number by visually estimating the loss and Enderle confirmed the amount when the remaining beans were removed. Beer's

testimony regarding seventy-three thousand, purportedly the capacity of the bin, and Berger's calculation that the bin contained 45,773.07 bushels supplied potential conflicts for Giauque to present to the jury.

**{¶33}** Giauque's effectively highlighted what he characterized as inconsistencies in the evidence regarding the amount of beans stored in the bin compared to the amount of beans remaining after the alleged theft and urged the jury to conclude no beans were missing.  The jury was free to resolve the inconsistencies by relying on the testimony of Beer and Enderle regarding the amount of beans missing from the bin. We find that the record contains sufficient evidence for a reasonable finder of fact to conclude, beyond a reasonable doubt, that beans were missing from the Enderle bin.

**{¶34}** In the second part of the first assignment of error, Giauque contends that there was no evidence that he knowingly exerted control over either the property or services of Centerra by deception as there was insufficient evidence that he delivered the beans. (R.C. 2913.02(A)(3)). Giauque notes that the clerk from Centerra was unable to identify him at trial and claims that there was no evidence that the beans sold at Centerra were the same beans taken from Enderle. He also argues that Centerra was not harmed by the sale as they were able to resell the beans on the market and recoup the funds paid to Giauque.

**{¶35}** Appellee provided a thorough review of Centerra's record of payments to Giauque for soy beans and the electronic deposits into Giauque's account at Sutton Bank. For each payment issued by Centerra to Giauque, there was a subsequent deposit to Giauque's bank account in the same amount. While the Centerra representative that purchased the soy beans was not able to identify Giauque, the matching transactions

supply sufficient evidence to convince a fact-finder, beyond a reasonable doubt, that Giauque was the person selling soy beans to Centerra.

**{¶36}** Giauque next contends that there is insufficient evidence to establish that he obtained payment from Centerra by deception, contending that the record contains no evidence the beans sold to Centerra were taken from Enderle's bin. He also argues that Centerra sold the beans that they purchased from him and therefore Centerra suffered no harm.

**{¶37}** Giauque used Eberle's gravity wagons, without his consent, to haul beans to Centerra and has admitted this infraction. He sold approximately ten thousand bushels, an amount matching Enderle's loss. He moved at least one load under the cover of the dark of night. He told Centerra he purchased the beans from a farmer, then told Enderle he was hauling them for a friend. And he was familiar with the operation of the Enderle farm and was aware that Enderle was out of the state when the beans were taken.

**{¶38}** We acknowledge that the state relies upon circumstantial evidence to support the charges against Giauque but "[c]ircumstantial evidence and direct evidence inherently possess the same probative value [.]" *State v. Jenks,* 61 Ohio St.3d 259, 272, 574 N.E.2d 492, 502 (1991) paragraph one of the syllabus. Furthermore, "[s]ince circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt." *Jenks*, supra at 272.

**{¶39}** While inferences cannot be based on inferences, a number of conclusions can result from the same set of facts. *State v. Lott* (1990), 51 Ohio St.3d 160, 168, 555

N.E.2d 293, quoting *Hurt v. Charles J. Rogers Transp. Co.* (1955), 164 Ohio St. 329, 331, 130 N.E.2d 820. Moreover, a series of facts and circumstances can be employed by a jury as the basis for its ultimate conclusions in a case. *Lott*, supra at 168 quoting *Hurt*, supra at 331.

{¶40} We find sufficient evidence in the record to convince a fact-finder, beyond a reasonable doubt that the beans Giauque sold to Centerra were not beans purchased from another farm, but were stolen from Enderle. Giauque used Enderle's gravity wagons to haul soy beans at night, represented that he had bought the beans from another farmer and later stated he was hauling them for a friend and was familiar with the Enderle operation as a result of working during the harvest.

{¶41} We also find that the record contains sufficient evidence that Giauque, with purpose to deprive the Centerra of property or services, did knowingly obtain or exert control over Centerra's property by deception. (R.C. 2913.02(A)(3)). He represented to Centerra that he purchased the beans or had authority to sell them when in fact he had no right to the beans as they were stolen property. The fact that Centerra recouped any loss by selling the beans is irrelevant. The statute contains no requirement that the Appellee demonstrate that the victim of the crime was harmed; the offense was committed upon the completion of the sale by Giauque. (R.C. 2913.02(A)(3)); *Eckels v. State*, 20 Ohio St. 508 (1870). The subsequent sale of the stolen property by Centerra had no impact on Giauque's criminal offense.

{¶42} Giauque's contention that there was insufficient evidence that he was using Enderle's gravity wagons ""for the purpose of devising or executing a scheme to defraud or to obtain property or services" whose value exceeded $7,500" fails for the same reason

as described above. (R.C. 2923.24(A)&(C)). The record contains sufficient evidence from which a fact-finder may conclude, beyond a reasonable doubt that Giauque was using Enderle's gravity wagons to steal and sell Enderle's grain.

{¶43} Giauque used Enderle's gravity wagons without his knowledge or consent to transport and sell approximately ten thousand bushels of soy beans. Giauque told Centerra that he purchased the beans from a farmer then explained to Enderle that he was hauling beans for a friend, but neither alleged source appeared at the trial to corroborate Giauque's comments. Enderle provided testimony that his bin was missing approximately ten thousand bushels of soy beans. After reviewing these facts and the balance of the evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have found, beyond a reasonable doubt, that Giauque used the stolen gravity wagons to exert control over the soy beans, falsely represented to Centerra that he was authorized to sell the beans and that he did receive payment for approximately ten thousand bushels of Enderle's beans as well as several loads of corn. The trial court did not err when it denied Giauque's Crim.R. 29 motion to dismiss.

{¶44} The analysis of the second assignment of error encompasses the same facts and mandates the same conclusion. Because we have found sufficient evidence to allow the jury to find, beyond a reasonable doubt, that Giauque committed the offenses as charged we must then conclude that there is no evidence that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered.

{¶45} Giauque's first and second assignments of error are overruled.

**III.**

**{¶46}** In his third assignment of error, Giauque contends that the trial court erred by admitting hearsay. He argues that Jason Enderle comment on redirect examination where he stated "they said you are missing this" (Trial Transcript p. 339, line 17) referring to his insurance company's evaluation of the loss that should have been excluded. He also contends the statement of Holly Cotter should have been excluded because she stated that the bean samples that she tested where not gathered by her and were labeled with the location where they were found by another. Giauque acknowledges that he did not object to these comments before the trial court and relies upon the decision in *State v. Richcreek, 6th Dist. No. WD-09-072, 196 Ohio App.3d 505, 2011-Ohio-4686, 964 N.E.2d 442* to support his contention that admitting these statements was plain error.

**{¶47}** The facts of *Richcreek* are significantly different making the holding inapplicable to the case before us. Richcreek was charged with rape and the evidence presented by the state contained repeated hearsay statements that bolstered the credibility of the victim in the context of admissible evidence that fell short of being overwhelming in favor of conviction. That court noted:

> Generally, the admission of an isolated hearsay statement may be deemed harmless error. Evid.R. 103(A); Crim.R. 52(A). This conclusion is typically appropriate when there is substantial and independent admissible evidence, other than the hearsay, to prove the elements of the crime. However, notwithstanding A.L.'s own testimony, the amount of inadmissible, or improperly used, hearsay in this case is significant. Multiple witnesses who repeat the same *528 extrajudicial statements in court

merely create a prejudicial reinforcing effect. A disputed statement is not made true simply because it is repeated. *Cf. State v. Butcher*, 170 Ohio App.3d 52, 2007-Ohio-118, 866 N.E.2d 13, ¶ 78–79.

*State v. Richcreek*, 6th Dist. No. WD-09-072, 196 Ohio App.3d 505, 2011-Ohio-4686, 964 N.E.2d 442, ¶ 76.

**{¶48}** The statements described by Giauque may be hearsay, but we find that they were insignificant in light of the other available evidence. With regard to Jason Enderle's statement that "they said you are missing this" the record shows that it occurred during redirect immediately after cross-examination where Enderle was asked to concede that he was compensated for his loss by the insurance company. The question during cross-examination was different, but it would allow any reasonable fact-finder to conclude that the insurance company evaluated the amount of the loss and paid Enderle for that amount. Because the record shows that the price of soy beans at the time was nine dollars per bushel and the payment was over 94,000, the insurance company's conclusion that Enderle suffered the loss of over ten thousand bushels of soy beans is evident without the hearsay statement.

**{¶49}** The testimony regarding the testing of the beans may have also been inappropriately admitted but we find that it was harmless beyond a reasonable doubt. The evidence did not prove that the beans were Enderle's but supported a conclusion that they beans were all from the same source. The balance of the evidence regarding the location where beans were found on the ground, the amount of beans delivered to Centerra and the lack of any viable alternative explanation render the weight and impact of this evidence insignificant.

**{¶50}** We find "the evidence in favor of conviction, absent the hearsay, so overwhelming that the admission of those statements was harmless beyond a reasonable doubt. We find the error here was not so prejudicial as to require reversal." (Internal citations omitted.) *State v. Kidder*, 32 Ohio St.3d 279, 284, 513 N.E.2d 311, 317 (1987)

**{¶51}** We further reject Giauque's contention the admission of this evidence was plain error as we do not find exceptional circumstances or a manifest miscarriage of justice created by their admission.

**{¶52}** The third assignment of error is overruled.

**{¶53}** The decision of the Ashland County Court of Common Pleas is affirmed.

By: Baldwin, J.

Wise, Earle, P.J. and

Gwin, J. concur.